**James L. SEXTON, Banking Commissioner of Texas, Appellant,**

v.

**MOUNT OLIVET CEMETERY ASSOCIATION, Appellee.**

**No. 14579.**

Court of Appeals of Texas, Austin.

Sept. 24, 1986.

Rehearing Denied Nov. 12, 1986.

Jim Mattox, Atty. Gen., Edna I. Ramon, Asst. Atty. Gen., Austin, for appellant.

Robert J. Hearon, Jr., Graves, Dougherty, Hearon & Moody, Austin, for appellee.

Before POWERS, BRADY and CAR-ROLL, JJ.

POWERS, Justice.

James L. Sexton, the Banking Commissioner of Texas, appeals from a final judgment rendered by the district court in a suit brought by Mount Olivet Cemetery Association, wherein the Association obtained declaratory and injunctive relief after a

non-jury trial. We will reform the judgment of the district court and affirm it as reformed.

## THE CONTROVERSY

The Banking Department of Texas is a component of the Finance Commission of Texas and the Commissioner is charged to enforce, through the Department, the provisions of Tex.Rev.Civ.Stat.Ann. art. 548b (1973 & Supp.1986). *See generally, id.* at arts. 342–207; 342–101—115; 342–201—211. Article 548b vests in the Department a regulatory power over the business of selling prepaid funeral services and merchandise, a business in which the Association is engaged under a permit issued by the Department. The Association conducts its business according to a plan which was approved by the Department in 1981 after an adjudicative hearing before the Commissioner. No party sued for judicial review of the order and the present case does not involve the issue of whether an agency order may be changed after its affirmance on judicial review.

The controlling issue on appeal is whether the Department has the power to reopen the 1981 administrative proceedings in order to reconsider its previous approval of the Association's plan—some three years

after it had become effective—to determine whether such approval should be modified or rescinded altogether, in light of new evidence, in light of consequences not anticipated in 1981, and, perhaps, in light of changes in administrative policy under a new Commissioner.[1] There is no contention that the Association is conducting its business in violation of any common-law duty, any statute, or any rule or regulation of any administrative authority; and, the parties have stipulated that the Association is conducting its business in accordance with the officially approved plan.

The district court concluded that the 1981 order approving the plan was a final order binding on the Department, and one that may not be modified or rescinded absent a showing by the Department that a material change of circumstances has occurred since 1981; provided, however, any such change may not include issues that might have been raised in the 1981 proceedings but were not. Accordingly, the district court enjoined any administrative proceedings directed at reconsideration of the 1981 order, save on the condition specified. From this judgment the Commissioner appeals raising various assignments of error, all of which depend ultimately on the single issue of whether the Department had jurisdiction to reopen the earlier administrative proceedings to reconsider the previous approval of

---

1. In several instances we will remark that the Department "evidently" or "apparently" wished to reopen the 1981 proceedings to consider whether new evidence or new administrative policy dictated that it should withdraw or modify its previous approval of the Association's plan and the 1981 order wherein that approval was given. Our tentativeness in this regard reflects the nature of the testimony given by a Department employee in the district-court proceedings we now review. His testimony reflects that the Department might not have considered in 1981 the vast sum of money (some $8,000,000 as of 1984) that would accrue on the sums deposited by the Association in trust, or that it might not have appreciated and given proper consideration to the factor of inflation, which might make it difficult to assign many of the Association's contracts with purchasers in the event the Association fails. From these parts of his testimony, we gather and assume in the Department an official position that it wishes to reconsider

the 1981 approval in order to assess these factors and related evidence, which it considers relevant to the issue of approval under § 1a of art. 548b; particularly, that it wishes to reconsider its 1981 policy decision that permitted it to consider, as bearing on the sufficiency of any safeguards set out in the Association's plan,

> its overall soundness, the underlying purpose of the plan, whether public or private, the exposure of the funds to taxation, the benefits reasonably contemplated by the plan, the character, fitness and responsibility of its management, and the availability of external safeguards to insure compliance with the plan.

We must admit, however, that there is no precise evidence or claim to that effect made by the Commissioner in the present case. We simply put the best case for the Commissioner as we are able to imagine it based upon the record before us.

the Association's plan, and perhaps to modify or rescind the Department's approval.[2]

## THE REGULATORY STATUTE

The Legislature enacted art. 548b for the primary purpose of protecting purchasers who had contracted and paid in advance (ordinarily by installment payments, according to the evidence) for funeral services and merchandise to be supplied by sellers at the death of individuals specified in the contracts. 1955 Tex.Gen.Laws, ch. 512, at 1292; *Falkner v. Memorial Gardens Ass'n*, 298 S.W.2d 934 (Tex.Civ.App.1957, writ ref'd n.r.e.). The basic statutory method chosen to secure such protection was to withdraw from sellers their otherwise absolute control over sums paid to them by purchasers. There are, however, other familiar aspects of regulation set out in art. 548b: the statute prohibits the sale of prepaid funeral services and merchandise except that it be done under an annual permit issued by the Department to the seller (§§ 1, 3, 9); any contract for such services and merchandise is unenforceable by the seller if the contract was made in violation of the statute; however, the purchaser may in such instances recover from the seller all sums paid under the contract (§ 1); and, the provisions of the statute are enforceable by criminal sanctions and by quo warranto proceedings (§ 9).

Section 5 of art. 548b establishes a basic obligatory scheme for the safeguarding of funds paid to a seller by purchasers:

1. The seller may retain as much as one half of sums paid under a contract until the seller has retained an amount not to exceed 10% of the contract price, such retention being for the purpose of allowing the seller to recoup his selling expenses, servicing costs, and general overhead.

2. The remainder of any sums paid by the purchaser must be deposited, within 30 days of receipt, to the seller's trust account in a savings and loan association, a bank, or a trust company, the seller being required to account on an individual-contract basis for all sums received and deposited.

3. On the death of the contract beneficiary, the balance of the purchaser's account "shall be released in fulfillment of the contract," the seller being required to supply any difference between the total sum paid in by the purchaser and the balance in his account.

4. The seller may, at any time, withdraw from the accrued interest or "income" earned on the principal sums so much as may be necessary to pay reasonable and necessary charges imposed by the depository institution, including trustees' fees, and "any taxes caused or created by reason of" the account.

5. The seller may, after performing a particular contract or after it has been cancelled by the purchaser, withdraw a proportional part of "any enhanced value, accrued interest, or accrued income of said contract...."

This basic scheme, established in § 5, may be avoided by a seller in only two circumstances. These are specified in § 1a of art. 548b. First, compliance with § 5 is excused when the seller's contracts are based upon a plan whereby the sums necessary to pay for the stipulated funeral services and merchandise will be supplied in the form of insurance proceeds payable under "a contract of insurance with an insurance company licensed in Texas," an evident reference to burial insurance. Second, compliance with § 5 is excused if the seller's contracts are based upon a plan whereby the necessary sums will be supplied from a

> fund, investment, security, or contract ... approved by the Department as safeguarding the right and interests of the

---

2. The Commissioner's points of error aver that the Association's original action in district court was barred by the doctrines of sovereign immunity, exhaustion of administrative remedies, and primary jurisdiction; that the Department had jurisdiction under the pertinent statutes to take the action it did, but in any case, it had retained expressly in the 1981 order a "discretion" to ascertain the continued existence of the "safeguards" upon which the 1981 order was predicated; and, that the Association could suffer no irreparable harm because it is possible that the 1981 order might not be modified or rescinded after its reconsideration by the Department.

[purchasers] to substantially the same or greater degree as is provided with respect to funds regulated by Section 5. . . .

The second, non-insurance alternative allowed by § 1a is in issue in the present case.

Because the controlling issue in the present appeal depends thereon, we shall set out the specific powers expressly delegated to the Department in art. 548b in order that it might administer the regulatory scheme, as it is directed to do in § 2:

1. the power to require that a seller supply evidence that the pertinent insurance premiums have been paid, where he has elected the insurance alternative allowed by § 1a, and the power to cancel his permit for failing to supply such evidence (§ 1a);

2. the power to approve any plan submitted by a seller who proposes to employ the non-insurance alternative allowed by § 1a, as the Association elected to do in the present case (§ 1a);

3. the power to promulgate "reasonable rules and regulations concerning the keeping and inspection of records, the filing of contracts and reports, and all other matters incidental to the orderly administration of" art. 548b, as well as the power to approve any forms used for sales contracts involving prepaid funeral benefits (§ 2);

4. the power to issue the requisite permits and to collect nominal fees therefor (§ 3);

5. the power to cancel permits or deny their renewal where the holder has failed to comply with any requirement of art. 548b or any rule or regulation, after notice and hearing if they are requested (§ 4);

6. the power to authorize withdrawals of funds payable to purchasers who have cancelled their contracts and supplied the sellers with an affidavit in a form prescribed by the Department (§ 5);

7. the power to require annual reports of permit holders and to prescribe the form thereof (§ 7);

8. the power to establish record-keeping requirements for sellers, to examine such records annually or more frequently when deemed necessary by the Department, and to assess and collect fees for such examinations (§ 8); and,

9. the power to have the Attorney General initiate criminal and quo warranto proceedings for violations of art. 548b (§ 9).

## THE 1981 ADMINISTRATIVE PROCEEDING

The Association, having determined to solicit sales under the non-insurance alternative allowed by § 1a, applied to the Department in 1981 for approval of its intended plan of operation, accounting, withdrawals, and distribution, contending that its proposed plan safeguarded buyers in substantially the same or greater degree as the protection furnished by § 5 of art. 548b. The proposed plan varied from § 5 in several respects. At issue in the present case is this basic difference: under its proposed plan, the Association would be entitled to withdraw periodically, and before cancellation or performance, *all* interest accruing on sums deposited by the Association in its bank trust account; whereas, under the basic scheme established in § 5, the Association would be permitted to withdraw from accrued interest only the amounts necessary to pay taxes and trustees' fees, as well as a proportional part of such interest on performance or cancellation of a particular contract. After an adjudicative hearing before the Commissioner, the Department on October 27, 1981 issued an order approving the plan. We shall summarize the terms of the order. There can be little doubt that the order was intended to be an adjudication of the issue of whether the plan safeguarded purchasers to the extent they would be protected under § 5. It contains a recital that the application was heard and determined under art. 548b and Tex.Rev.Civ.Stat.Ann. art. 6252–13a (Supp.1986), the Texas Administrative Procedure and Texas Register Act; that no protests were filed opposing the application; that the Association appeared by and through its attorneys and corporate officers; that the hearing was

attended by them and by the Department general counsel and other Department staff members, as well as "other interested observers"; and, that the Association adduced documentary and testimonial evidence in support of its application and contentions, but the Department "offered no evidence."

The foregoing recitals are followed by an exposition of the Commissioner's determination that, under a recent opinion of the Attorney General, the statutory expression "fund, investment, security or contract," found in § 1a of art. 548b, required a "consideration of all aspects of" the plan proposed by the Association, including

> its overall soundness, the underlying purpose of the plan, whether public or private, the exposure of the funds to taxation, the benefits reasonably contemplated by the plan, the character, fitness and responsibility of its management, and the availability of external safeguards to insure compliance with the plan.

This recital in the 1981 order reflects a determination of administrative policy: whether purchasers were safeguarded "to substantially the same or greater degree" would depend upon the Department's evaluation of all the logically relevant factors listed in the quotation; that is to say, the issue would not be determined solely by whether the proposed plan contained all or most of the withdrawal limitations and other protective devices imposed in § 5 of the regulatory statute.

The order concludes with the Commissioner's finding of ultimate fact that the proposed plan safeguarded individual purchasers "to substantially the same or greater degree as" would be the case under § 5 and his conclusion of law that the application should be granted. These are accompanied by 34 findings of basic fact and 11 conclusions of law that clearly explain his rationale and justify his ultimate finding of fact. Among them is his determination that an essential part of the proposed plan is the Association's right to withdraw all accrued interest on quarterly application

therefor, accompanied by assurances that the plan is being carried out as approved and apparently conditioned upon the Department's future determinations that the approved plan and attendant safeguards "are still being followed and [are] in effect."

## THE 1984 ADMINISTRATIVE PROCEEDINGS

For a number of years after 1981, the Association regularly withdrew all accrued interest on quarterly applications approved by the Department. Apparently, however, the Department in 1984 became apprehensive about the sufficiency of the plan with regard to whether purchasers were protected to the extent they would have been under § 5. The apprehension evidently arose from a comparison made by a Department employee who concluded that some $8,000,000 in accrued interest would be still in the trust account maintained by the Association had withdrawals of such interest been restricted to the occasions and limits set out in § 5. Instead, there was nothing comparable to that sum after almost four years of operation under the approved plan. The Association rejoins that the 1981 plan *had* safeguarded purchasers in the requisite degree, and continued to do so, for the very reasons set out in the Department's 1981 order: owing to the Association's status as a non-profit corporation, and to certain aspects of its corporate structure, properties, and operations, none of the accrued interest had been diverted to taxation or private gain, as it would have been in the ordinary case governed by § 5; rather, the bulk of the withdrawn interest had been used to purchase other assets belonging to the Association and these remained available as an ultimate safeguard that the Association would be able financially to perform its contracts with purchasers or meet their demands for refunds. (The Association's contention was established by evidence adduced at trial in the present case and appears to be undisputed by the Department.)

Because of the Department's apprehension, on June 12, 1984 it peremptorily refused to approve the Association's application to withdraw $654,000 in accrued interest. Thereupon the Association filed in district court an original action to enforce the terms of the 1981 order. While the suit was pending, the Commissioner on November 7, 1984 approved the disputed application to withdraw $654,000. On December 12, 1984, however, he issued notice that he would conduct a hearing to determine whether the approved plan safeguarded the rights and interests of purchasers to the same degree as § 5 of art. 548b. This notice was evidently superseded by a subsequent notice wherein he stated his intention to hear and determine whether the 1981 order approving the plan should be rescinded or modified and whether the Association's permit should be cancelled.[3] In the interim, and after some delay, the Commissioner approved the Association's subsequent application to withdraw an additional $1,700,000 in accrued interest. He had not acted, at the time of trial in the present case, on the Association's still-later application to withdraw an additional $536,000 in accrued interest. The evidence adduced at trial showed, without contradiction, that these delays posed a severe threat to the Association's continued operation.

The Association moved in the 1984 administrative proceedings that they be dismissed for want of jurisdiction in the Department, it being undisputed that the Association was conducting its affairs and requesting withdrawals of accrued interest in compliance with the 1981 order and approved plan. The Commissioner overruled the motion. Not having dismissed its district-court suit, the Association thereupon amended its pleadings in that suit to contend the Department was without jurisdiction to reopen the 1981 proceedings. The Association requested declaratory relief to that effect as well as injunctive relief to forbid the Commissioner's proceeding and to compel his observance of the 1981 order approving the plan.

## THE DISTRICT–COURT PROCEEDING

In the district-court suit, the Association applied for a temporary injunction to restrain the Commissioner from conducting the administrative hearing he had ordered. The application was heard on June 25, 1985 and the parties agreed at trial that the evidence adduced in that hearing should be acted upon by the district court in its consideration whether to grant the declaratory and permanent injunctive relief for which the Association prayed. On September 5, 1985, the district court granted such relief in a final judgment of that date.[4] We

---

**3.** The record on appeal does not reveal the specific content of either of the two notices issued by the Commissioner in late 1984. However, the parties' briefs are in accord as to their substance and we have characterized the contents of the notices as stated in the briefs.

**4.** The final judgment is accompanied by the court's findings of fact and conclusions of law. In summary, the court found: the Association had carried out the approved plan in all material respects; the Association possessed valuable property rights in the approved plan; it had arranged its business affairs in reliance thereon; the actions of the Department in refusing to approve withdrawals and in delaying in that regard, together with its threat to reconsider, revoke, or withdraw the 1981 final order, had the effect of violating the Association's "substantial rights," interfered with its business, created uncertainty, damaged its financial standing and stability; and such actions by the Commissioner

had caused and would cause irreparable harm to the Association.

In the court's conclusions of law, it determined that the 1981 order was "final and binding" and that the Association was "entitled as a matter of law to the benefits thereof"; the 1981 order could be changed by the Department "only by a showing of materially changed conditions or a failure to follow the" approved plan; the parties had stipulated that the approved plan was being carried out in all material respects; there was no allegation or showing by the Department of any changed conditions intervening since the 1981 order; and, it was therefore "the mandatory and ministerial duty of the Commissioner to continue to approve withdrawals of accrued interest ... pursuant to the 1981 Order." Moreover, in its conclusions of law, the district court defined "material change of conditions" to mean only those changes which have intervened since the date of the 1981 final order provided they did "not constitute issues which might have been raised" in the 1981 proceedings "had ade-

review such judgment in the present appeal brought by the Commissioner.

## THE APPLICABLE RULES OF STATUTORY CONSTRUCTION

The controlling issue on appeal is whether the Department possesses the authority to reopen the 1981 administrative proceedings and determine anew, based upon new evidence showing the actual operation of the approved plan since 1981 and perhaps based as well upon changes in administrative policy, whether the plan safeguards purchasers to the extent they would be protected under § 5 of art. 548b. The question was determined favorably to the Association in 1981 but the Department claims authority to reopen the proceedings in order that it might reconsider the question. The controlling issue presents, of course, a problem of statutory construction to be determined according to certain well-established rules.

■ In any case of statutory construction, the court must follow the "cardinal rule" which requires that it seek out the legislative intent from a general view of the whole enactment; and, once that intent has been ascertained, it follows as a matter of course that the court shall construe any questioned part of the statute so as to give effect to the legislative purpose. *Citizens Bank of Bryan v. First State Bank*, 580 S.W.2d 344, 348 (Tex.1979). The court is not responsible, however, for omissions in legislation; rather, it must simply give a true and fair interpretation of the statutory language, which means an interpretation that is neither forced, exaggerated, nor strained, and the meaning settled upon must be one suggested by the statutory language and one the language will fairly sanction and clearly sustain. *Railroad*

*Commission of Texas v. Miller*, 434 S.W.2d 670, 672 (Tex.1968).

■ Certain rules of substantive law, applicable to administrative agencies, also bear upon the proper construction to be given art. 548b. It is axiomatic that such agencies are creatures of statute and have no inherent authority. They may, therefore, exercise only those specific powers conferred upon them by law in clear and express language, and no additional authority will be implied by judicial construction. However, with respect to *a* power specifically granted the agency, the full extent of *that* power must be ascertained with due regard for the rule that the Legislature generally intends that an agency should have by implication such authority as may be *necessary* to carry out the specific power delegated, in order that the statutory purpose might be achieved. Moreover, the Legislature impliedly intends, as a general rule, that an agency should have whatever power is *necessary* to fulfill a function or perform a duty placed expressly in the agency by the Legislature. The Legislature does not intend that agency functions be an exercise in futility. *State v. Jackson*, 376 S.W.2d 341 (Tex.1964); *Stauffer v. City of San Antonio*, 162 Tex. 13, 344 S.W.2d 158 (1961); *Key Western Life Ins. Co. v. State Board of Insurance*, 163 Tex. 11, 350 S.W.2d 839 (1961); *Railroad Commission v. Rowan*, 152 Tex. 439, 259 S.W.2d 173 (1953); *Humble Oil & Refining Co. v. Railroad Commission*, 133 Tex. 330, 128 S.W.2d 9 (1939); *Railroad Com'n v. Red Arrow Freight Lines*, 96 S.W.2d 735 (Tex.Civ.App.1936, writ ref'd).

■ The agency may not, however, on a theory of necessary implication from a specific power, function, or duty expressly del-

quate and diligent research been conducted to discover such facts [sic]."
The judgment permanently enjoins the Commissioner to approve the quarterly applications for withdrawals of accrued interest so long as the approved plan is being carried out in all material respects; and, forbids his "holding or threatening to hold a hearing or other proceeding for the purpose of revoking or modifying the terms of the 1981 Order, except a hearing, at which

the burden of proof shall be ... upon the Commissioner, for the purpose of establishing that the" approved plan is not being carried out or that there has been a "material change of conditions" since rendition of the 1981 order. The judgment specifically preserves the Commissioner's power to exercise "his general regulatory or audit powers except as such exercise conflicts with the 1981 order approving the" plan.

egated, erect and exercise what really amounts to a new and additional power or one that contradicts the statute, no matter that the new power is viewed as being expedient for administrative purposes. *Key Western Life Ins. Co. v. State Board of Insurance, supra* (power to withdraw approval of policy form on specified statutory grounds may not be extended by implication to permit agency to withdraw approval on another ground); *Stauffer v. City of San Antonio, supra* (power to ascertain physical and mental fitness not impliedly given City by statute entitling firemen to re-employment by the City if physically and mentally fit, following military leave); *Commonwealth of Massachusetts v. United N. & S. Dev. Co.,* 140 Tex. 417, 168 S.W.2d 226 (1942) (statutory requirement for two sureties on a bond, each liable for twice the amount of the debt secured, may not be altered by implication to permit the two sureties to undertake disparate obligations, even though the debt be twice secured); *Humble Oil & Refining Co. v. Railroad Commission, supra* (power to fix certain prices of natural gas not implied from numerous statutory powers over other aspects of natural gas business); *Commercial Standard Ins. Co. v. Board of Ins. Com'rs,* 34 S.W.2d 343 (Tex.Civ. App.1930, writ ref'd) (power to fix certain insurance commissions not implied from numerous statutory powers over other aspects of insurance business).

Finally, we should observe that we may not by implication enlarge the meaning of any word in the statute beyond its ordinary meaning, and implications from any statutory passage or word are *forbidden* when the legislative intent may be gathered from a reasonable interpretation of the statute *as it is written.* Implications are permissible only when the court has first concluded that the Legislature *obviously* intended the agency to have the power it claims by implication. *Commonwealth of Massachusetts v. United N. & S. Dev. Co., supra.*

These general rules have particular application in the matter of determining whether an agency has the power to reopen administrative proceedings with a view toward reconsidering its earlier adjudicative order, after it has become effective, and possibly modifying or rescinding that order. Whether such a power exists in the agency remains a question to be determined by an interpretation of the statute that vests the agency with administrative power. *Texas & N.O.R. Co. v. Railroad Commission,* 145 Tex. 541, 200 S.W.2d 626 (1947) (Commission's power to authorize discontinuance of short-line passenger service implied from statutory provision giving Commission power to "relax" minimum—service requirements where gross annual passenger revenue fell below $3600, it being shown that such service over route in question could be provided only at an operating *loss* ); Schopflocher, *The Doctrine of Res Judicata in Administrative Law,* 1942 Wis.L.Rev. 5, 17; Annot., 73 A.L.R.2d 939, 942 (1960); Davis, Administrative Law Text, § 11.09, at 369–71 (3rd ed. 1972).

Frequently, the statute may reflect that the Legislature has *expressly* delegated such a power to the agency, doing so in terms that are more or less specific as to the scope of the power and the occasions when it may be exercised. For example, the Industrial Accident Board may, on a showing of changed conditions, mistake, or fraud, review its earlier compensation award and revoke or change the pertinent agency order under an express grant of that power contained in Tex.Rev.Civ.Stat. Ann. art. 8306, § 12d (1967). The Public Utility Commission may "revoke or amend any certificate of convenience and necessity," that it has previously issued, if the agency finds that the holder of the certificate never supplied the authorized utility service or has ceased doing so, as expressly stated in Tex.Rev.Civ.Stat.Ann. art. 1446c, § 62 (Supp.1986). The Air Control Board may from time to time, and for good cause shown after notice and hearing, modify its previously approved variances to impose new or additional conditions, as that power is expressly given in Tex.Rev.Civ.Stat.Ann.

art. 4477–5, § 3.23 (1976 & Supp.1986). The Texas Aeronautics Commission may revoke, amend, or suspend its previously issued certificate of convenience and necessity, after notice and hearing, under a power expressly delegated to it in Tex.Rev.Civ. Stat.Ann. art. 46c–6 (Supp.1986). The Texas Water Commission may amend permits previously issued by it, authorizing certain discharges of waste, because it is expressly empowered to do so under Tex. Water Code Ann. art. 26.027 (Pamph.Supp.1986). In this regard, we observe that the Department of Banking, under the very statute we are required to construe in the present case, has received such a power from the Legislature in express and quite specific terms: The Department may cancel a permit previously issued by it *if the holder fails to supply evidence that insurance premiums have been paid,* as stated in § 1a, or *if the holder fails to comply with any of the requirements of art. 548b or any rule or regulation of the Department,* as stated in § 4 of art. 548b.

Even in the absence of an express and specific delegation of the power to reopen an administrative proceeding, it is rather simple in many cases to conclude that the Legislature intended that the agency have that power as a *necessary* adjunct to other powers it has delegated to the agency, or as a necessary adjunct of the duties and functions expressly assigned the agency, it being manifest that the Legislature *must* have intended a workable and effective exercise of the powers expressly and specifically granted the agency, directed in most cases toward protecting the public interest and not the private interests of the regulated persons, organizations, or activities. In such cases, the power to reopen may be *implied.*

The Texas Railroad Commission is, for example, charged by the Legislature to administer several statutes to prevent the "waste" of oil and gas. These statutes were construed by the agency for many years as giving it the power to review and reconsider its orders *refusing* certain kinds of applications for well permits, *irrespective* of whether there had been any intervening change of circumstances. No statute explicitly gave the Commission that power, but in light of the statutory scheme, the administrative functions assigned the Commission under that scheme, and the constitutional necessity of the power to accomplish those tasks, the statutes were construed as giving the Commission the power by implication. *Magnolia Petroleum Co. v. New Process Production Co.,* 129 Tex. 617, 104 S.W.2d 1106 (1937). In another case, the Commission was said to possess by necessary implication the power to review and modify its proration orders so as to meet the situation "where conditions have changed materially, new and unforeseen problems arise or mistakes are discovered." *Railroad Commission v. Aluminum Company of America,* 380 S.W.2d 599, 602 (Tex.1964). In each of these decisions, the statute involved (Tex. Rev.Civ.Stat.Ann. art. 6049c, §§ 5, 7, now codified as Tex.Nat.Res.Code §§ 85.-049–.053, 85.058–.064 (1978)) almost amounted to an express delegation to the Commission of a power to reconsider its previous orders in oil and gas matters, for it directed the Commission, on complaint or on its own "initiative," to inquire *"from time to time"* into any aspect of the oil and gas business to determine, after hearing, whether "waste" was occurring or was imminent and to issue whatever "rule, regulation or order" may be "reasonably required to correct, prevent or lessen such waste." [5]

---

**5.** The decisions of the Supreme Court of Texas in *Magnolia Petroleum Co. v. New Process Production Co., supra,* and *Railroad Commission v. Aluminum Company of America, supra,* manifestly do *not* stand for the proposition that an administrative agency possesses an *inherent* power to change its previous adjudicative orders "when conditions change." Indeed, the former decision stands for the proposition that the Railroad Commission, under statutes administered

by it, possesses the power to set aside its earlier orders *whether or not* conditions have changed. Because these two decisions might easily be misunderstood, we shall analyze them briefly.

The decision of the Supreme Court in *New Process* addressed this issue: Did the Railroad Commission, under a proper interpretation of the relevant statutes, possess a power to reconsider its previous *denial* of a Rule 37 exception,

Note 5—Continued

whether or not circumstances had changed since that denial?

Rule 37 is the Commission's state-wide spacing rule, establishing minimum distances between wells. Under the Rule, a permit to drill a well may not be issued unless the proposed well is located to meet the minimum spacing requirements. The rule provides for two exceptions: (1) to prevent the confiscation of property; and (2) to prevent "waste." Authority for the rule rests upon the Commission's delegated power to prevent the "waste" of oil and gas. Tex.Rev. Stat.Ann. arts. 6014, 6029, 6046 (1936); *Brown v. Humble Oil & Refining Co.*, 126 Tex. 296, 83 S.W.2d 935, 87 S.W.2d 1069 (1935). Thus, the Rule 37 exception to prevent "waste" has an obvious statutory base. The basis for the Rule 37 exception to prevent "confiscation" also rests upon the Commission's statutory power to prevent "waste," but it does so only by way of necessary implication.

Before the Commission may act to prevent "waste," in applying Rule 37, it must also allow a corollary exception to prevent "confiscation," for without *that* exception Rule 37 would be unconstitutional. Hyder, *Some Difficulties in the Application of the Exceptions to the Spacing Rule in Texas*, 27 Tex.L.Rev. 481, 485–86 (1949); Hardwicke, *Oil Well Spacing Regulations and Protection of Property Rights in Texas*, 31 Tex.L. Rev. 99, 105–07 (1952). Thus, the entirety of Rule 37 is grounded upon the expressly delegated power and duty given the Commission by the terms of Tex.Rev.Civ.Stat.Ann. art. 6049c (1936), now codified at Tex.Nat.Res.Code §§ 85.-049, .052, .058 (1978).

Sec. 5. The Commission shall have the power, and it shall be its duty, *from time to time to inquire* into the production ... of crude petroleum oil and natural gas, and the reasonable market demand therefor, in order to determine whether or not waste exists or is imminent, or whether the oil and gas conservation laws of Texas or the rules ... of the Commission promulgated thereunder are being violated.

Sec. 7. Upon the initiative of the Commission, or upon the verified complaint of any person interested in the subject matter, that waste of crude petroleum or natural gas is taking place ... or is reasonably imminent, the Commission may *hold a hearing* ... to determine whether or not waste is taking place, or is reasonably imminent and what, if any, rule, regulation, or order should be made ... to correct, prevent, or lessen such waste. *From and after* the promulgation of any rule, regulation or order of the Commission it shall be the duty of each person affected thereby to comply with the same.

(emphasis added). The statute has not changed in any material respect from the form in which it existed at the time of the *New Process* decision. This is an *express* delegation in the *broadest* possible terms of a *continuing* power to prevent by "rule, regulation, or order" any "waste" or "confiscation" *whenever* either may be found to exist "from time to time." The question in *New Process* was whether the Commission correctly determined that the sweeping scope of this statute included a power in the agency to reconsider its previous denial of a Rule 37 exception, *whether or not* circumstances had changed. Without analysis in its opinion, the Supreme Court sustained the Commission's interpretation based upon two grounds: the various statutes administered by the Commission permit the Commission's interpretations; and, it ought not be disturbed when "vast property rights have become vested by orders entered in such" reconsiderations. 104 S.W.2d at 1110.

In *Aluminum Company*, the Supreme Court acknowledged in dicta its previous statement in *New Process* regarding the Commission's power to reconsider its orders. But the issue in *Aluminum Company* was *not* whether the Commission had the *power* to change or set aside its previous orders. The power was admitted and obvious under *New Process*. Instead, the question raised was whether Alcoa might *compel* the Commission to set aside its earlier orders consistently applying to a particular field a proration formula that was applied statewide. The Supreme Court acknowledged the Commission's power in that regard, and it also acknowledged Alcoa's legal right to show a change of conditions that would justify a different formula. The Court held, however, that the evidence in the case did not show such a change of conditions of the requisite character and, in any event, Alcoa was barred from making such a showing because of its want of diligence in exercising its right to judicial review of the Commission's previous application of the formula to the field in question. 380 S.W.2d at 602–03.

The *New Process* and *Aluminum Company* decisions were cited by this Court in *South Tex.Ind. Services v. Texas Department of Water Resources*, 573 S.W.2d 302 (Tex.Civ.App.1978, writ ref'd n.r.e.). The opinion states in over-broad language:

It is well settled that when a suit is brought to test the validity of an agency order, the agency loses jurisdiction over the subject matter of such order while the suit is pending. *It is equally well settled that an agency has the right to reopen a matter and enter a different order upon a showing of changed circumstances;* however, the agency does not have the authority to review a former order upon the same fact situation.

573 S.W.2d at 304 (emphasis added). As authority for its statement, the Court in *South Texas* cites the *Aluminum Company* and *New Process* decisions, as well as *Railroad Commission v. Humble Oil & Refining Co.*, 119 S.W.2d 728 (Tex.Civ.App.1938, writ ref'd). The last-named decision actually deals with the doctrine of res judicata, a distinctly different proposition from the question of whether an agency has the pow-

■ It may be, however, that some feature or aspect of the statute or the functions assigned the agency will *inhibit* an inference in favor of a power to reopen, when it is not expressly delegated to the agency. The inference will not be drawn where the statute in question expressly delegates a particular power *and* prescribes the method of its exercise by the agency. In such cases the inference is drawn that the Legislature intended the prescribed method to *exclude* all others, so that it alone may be employed by the agency in any exercise of the delegated power. *Cobra Oil & Gas Corp. v. Sadler,* 447 S.W.2d 887 (Tex.1969); *Foster v. City of Waco,* 113 Tex. 352, 255 S.W. 1104 (1923).

Where the culmination of the administrative proceeding is the creation of a substantial right of property (as in a franchise), where the proceedings entail great financial expense to the parties, or where a party reasonably would be expected to change his position in important matters in reliance on the resulting order, the Legislature's omission to delegate expressly and specifically the power to reopen suggests an unmistakable inference *contrary* to any implied grant of that power. In such cases, the Legislature's silence as to that power implies that the Legislature did *not* intend the agency should have it. Schopflocher, *supra,* at 21; 73 A.L.R.2d, *supra,* at 953.[6]

Note 5—Continued

er to reopen. Davis, Administrative Law Text, *supra,* § 18.09; Schopflocher, *the Doctrine of Res Judicata in Administrative Law, supra.*

In *South Texas,* the Department had revoked, after notice and hearing, a permit that it had issued a year previously. As mentioned in the *South Texas* opinion, the Department acted under the following delegation of power:

The [Texas Department of Water Resources] *has the authority,* for good cause, after hearing with notice ... *to revoke or amend any permit* it issues for reasons pertaining to public health, air or water pollution, land use, or violation of this Act or of any other applicable laws or regulations controlling the disposal of solid waste. Tex.Rev.Civ.Stat.Ann. art. 4477–7, § 4(e)(8) (Supp.1974–75).

(emphasis added). Thus, in *South Texas* there could be no question of the agency's power to reopen the proceeding wherein a permit was granted in order for it to determine whether the permit should be revoked or amended. The statute *expressly* gave the agency those very powers.

Nothing in *Westheimer Independent Sch. Dist. v. Brockette,* 567 S.W.2d 780 (Tex.1978), suggests that an administrative agency possesses inherent power to reconsider its earlier adjudicative orders in light of changed "conditions" or circumstances. The decision in that case rested upon an entirely different ground and concerned a quite different matter. The relevant part of the opinion dealt with the school district's contention that the Commissioner of Education possessed "jurisdiction" to rescind an earlier order of the State Board of Education when the order was "void." The Court distinguished two decisions proffered by the school district, one of which was the *Magnolia* decision discussed above, saying:

In contrast to *Jayton* [*Rural High Sch. Dist. v. Girard Ind. Sch. Dist.* 157 Tex. 115, 301 S.W.2d 80 (1957) ] and *Magnolia,* the instant case is not an attempt by a governmental agency to

rescind its own final order but is an attempt by a lower administrative office, the Commissioner, to rescind an order of a superior agency, the State Board of Education.

The Court then proceeded to discuss the school district's third proffered authority, which *did* involve the issue of when a lower administrative body—a local board of school trustees—may "modify or change a final order of the State Board of Education if there was a material change of conditions." The opinion then recites the difficulties involved in determining whether there has been a "material change of conditions," which might be useful in the present case *if* the Department was possessed of the power to revise its adjudicative orders in light of a "material change of conditions." But, as discussed in the text of this opinion, the statute under which the Department claims that power does not give it, either expressly or by implication.

6. When the statute does not reflect an express delegation of the power to reopen an administrative proceeding, or when the statute is unclear as to the grounds for reopening *if* the power *is* delegated, many complexities arise, as described in Davis, *Administrative Law Text, supra,* at 370:

When statutes are silent and legislative intent unclear and reviewing courts must work out the practices and the limits on reopening. The considerations affecting reopening to take account of new developments or of new evidence of old developments often differ from those affecting the correction of mistakes or shifts in judgment about law or policy. Usually the search for a basic principle to guide reopening is futile; the results usually must reflect the needs that are unique to each administrative task. Factors to be weighed are the advantages of repose, the desire for stability, the importance of administrative freedom to reformulate policy, the

■ It may be thought, perhaps, that the statutory characterization of an agency order as "final" determines the issue—if the order is a "final" order under such a statute, that characterization precludes any implication that it might be modified or rescinded in a new proceeding. This is not the case, however, because the concept of finality is not the same in all contexts. For example, in *Smith v. Wald Transfer & Storage Co.*, 97 S.W.2d 991 (Tex.Civ.App. 1936, writ dism'd), the opinion refers repeatedly to a "final" order issued by the Texas Railroad Commission, but the substance of the opinion and the holding is that the Commission lacked the statutory power to rehear and reconsider its previous adjudicative order, in a motor-carrier case, for reasons of statutory construction set out in the opinion. The attribute of finality was a *consequence* of that construction and *not* a determinant thereof. Similarly, that an order is "final" for purposes of judicial review, under §§ 16 and 19 of the Administrative Procedure and Texas Register Act, does not determine whether the agency may reopen the pertinent agency proceedings to reconsider its earlier adjudicative order after it has gone into effect— the two concepts of finality raise entirely different questions and considerations. *Civil Aeronautics Board v. Delta Air Lines*, 367 U.S. 316, 326, 81 S.Ct. 1611, 1619, 6 L.Ed.2d 869 (1961); *Sproles Motor Freight Line v. Smith*, 130 S.W.2d 1087, 1088 (Tex.Civ.App.1939, writ ref'd).

■ We should note, however, that the Administrative Procedure and Texas Register Act *does* vest in most administrative agencies a literal but limited power of reconsideration: so long as a motion for rehearing is pending before the agency, its "final" order is really provisional and the agency possesses the power to reconsider its earlier decision under the express language of § 16. It loses jurisdiction to do so only when the motion is overruled expressly or by operation of law. *Railroad Commission of Texas v. Continental Bus*

*System, Inc.*, 616 S.W.2d 179 (Tex.1981). But this literal and limited power of revision is not related to the issue raised in the present case. Section 16 of the statute has the purpose of allowing the agency an opportunity to correct errors of law, procedure, fact, or administrative policy *based upon the record compiled in the proceeding terminated by the order*. This is far different from the purpose to be accompanied by the power claimed by the Department in the present appeal—the power to change an earlier adjudicative order in a contested case based upon what has transpired *since* 1981—that is, a power to reopen the administrative proceeding, after the 1981 order has been in effect for a number of years, in order to consider *new* and intervening facts and administrative policy, based upon a *new* record with *new* evidence and legal argument.

Finally, we should remark that "[n]othing hinges on whether a reopening is the commencement of a new proceeding or a continuation of the old one; whichever it is, the problem is to determine when a reopening should be permitted and when not." Davis, *Res Judicata in Administrative Law*, 25 Tex.L.Rev. 199, 236 (1947); *see also*, Schopflocher, *supra*, at 24.

It is left to us then to apply these rules of construction to the terms of art. 548b to determine whether the Department possesses the power it claims, it being obvious that the power must be found in the statute, in express terms or by necessary implication from the grant of a specific power, duty, or function, and not in the agency's own view of what powers it *should* have for a proper performance of its functions and duties in the public interest. The latter is a problem to be brought to the attention of the Legislature.

## HOLDINGS AND DISCUSSION

■ A reading of art. 548b establishes the following: (1) the Legislature *does not* therein delegate in express terms the specific power claimed by the Department in

extent of party reliance upon the first decision, the degree of care or haste in making the

earlier decision, the general equities of each problem.

this case—the power to reopen the 1981 proceedings in order to consider anew, based upon new evidence and new administrative policy, whether the Association's plan shall have the Department's continuing approval; (2) the statute *does*, however, expressly delegate to the Department a specific power to re-examine its previous actions, based upon intervening circumstances, in two respects only—it may cancel a seller's permit for his failure to supply evidence that he has paid the insurance payments contemplated in § 1a, and it may cancel a seller's permit for his failure to comply with the statute or a rule or regulation promulgated by the Department (§§ 1a, 4). Thus, if the claimed power exists at all in the Department, it must exist by necessary implication from some specific power expressly delegated to the Department in art. 548b. We hold the implication to be unwarranted for the following reasons.

First, the Legislature's express delegation of the power to cancel a seller's permit on the specific ground that he has failed to comply with the statute, including the requirement that he supply evidence that insurance premiums have been paid, or failed to comply with the statute or the rules and regulations of the Department, is an express delegation of the power to inquire into specific aspects of a seller's continuing conduct under his permit. It is tantamount to an express declaration that the power does *not* exist in other respects, such as the claimed power to re-examine the Department's previous approval of a non-insurance plan under § 1a. "It is a settled rule that the express mention or enumeration of one person, thing, consequence, or class is equivalent to an express exclusion of all others." *State v. Mauritz-Wells Co.,* 141 Tex. 634, 175 S.W.2d 238, 241 (1943). Moreover, it is tantamount to a legislative determination that administrative enforcement of the statute shall be by cancellation of a permit, or by denying its renewal, and not by a reconsideration of an approval previously given under § 1a, based upon a new record. *Cobra Oil & Gas Corp. v. Sadler, supra; Foster v. City of Waco,* *supra.* We would here set forth a more extensive analysis of the doctrine of *expressio unius est exclusio alterius* were this the sole ground for our holding. It is not, however, and there are more compelling reasons for that holding.

Next, it is quite evident that the Legislature intended art. 548b to be a complete regulatory scheme, enforceable in a particular manner as mentioned above. It is enforceable administratively through the ultimate control given the Department over a seller's permit, without which he may not lawfully operate at all; and it is enforceable judicially as to all sellers, whether they have permits or not, through criminal sanctions and the quo warranto powers given the Attorney General (§§ 1a, 2, 3, 4 & 9). The duration of permits issuable by the Department is quite short—one year—and they must be expressly and specifically renewed by the Department each year, or the holder may not lawfully conduct his business. We note, however, that nothing in art. 548b specifies what factors the Department must consider before issuing an original permit or renewing one on payment of the moderate fees specified in the statute. We conclude then that the Department is left to determine, from its own experience and decisions, what factors might be relevant to such departmental decisions in order to accomplish the Legislature's purpose of protecting purchasers. Furthermore, the Department is expressly delegated the widest power to promulgate rules to effectuate its administrative policies in this and other respects (§ 2), coupled with an express power to cancel a permit or deny its renewal for a holder's failure to comply with the Department's rules (§§ 2, 4). *See generally, Falkner v. Memorial Gardens Ass'n, supra.* The Department has not contended that these expressly delegated powers are in any way insufficient for it to perform its continuing duty of protecting purchasers. Given that the Department *has* such great flexibility and power under an orchestration of its rulemaking power and its power over permits, which are valid for only one year, it is difficult indeed to

conceive as *necessary* the claimed power to reopen and reconsider the Department's previous approval under § 1a.[7] But there are still other considerations that negate such a power when art. 548b fails to delegate it in express terms.

■ The power of approval given in § 1a obviously includes by implication whatever powers are necessary to effectuate that power. This includes, we should think, the implied power to hold a hearing, the implied power to determine what factors might be important in arriving at a decision whether a proposed plan safeguards purchasers to the extent they would be protected under § 5, and the implied power to withhold approval if that is the Commissioner's decision. These unexpressed powers *are* properly implied under the rules we have discussed heretofore. But to imply a power to reconsider the matter entirely, after the 1981 order has gone into effect, based upon a new record, is to imply impermissibly an entirely different kind of power and one the Legislature would have delegated expressly had it intended the Department to have it. *Key Western Life Ins. Co. v. State Board of Insurance, supra.* We have found no applicable authority for the theory that a simple grant of the power of approval, in and of itself, necessarily implies a grant of the power to reconsider that approval based on a change of circumstances occurring after the pertinent order has gone into effect. That is to say, we have found no such authority when the agency is given other and ample means to deal with changed circumstances.

The 1981 order expressly recognized the Association's commitment of large sums of money to a trust integrated with the plan for which the Association sought the Department's approval. The order stated that the Association would forbear to withdraw certain sums that it would otherwise be entitled to divert to its own use under § 5; that the Association's right to withdraw all accrued interest was an "essential" part of its proposed plan and a right upon which it would rely in the future if the Department gave its approval to the plan; and, that the

---

**7.** It may happen that an agency's delegated power to grant or withhold its approval is the *sole* coercive method given the agency for administrative enforcement of a continuing duty assigned the agency under a statute. For example, a federal statute directed the Secretary of Agriculture to prevent the sale of unfit meat in interstate or foreign commerce and, in that connection, empowered him to inspect the manufacture of meat products, one of which was oleomargarine. The statute also forbade such sale of meat products under a "false or deceptive name," making such sales a criminal offense. Excluded from the prohibition were sales under a tradename that was (1) an established tradename or one usual to the product; (2) not false and deceptive; and (3) approved by the Secretary. Blanton Manufacturing Company used an established trade name for its margarine ("Creamo"), expended thousands of dollars in its use, and had obtained the Secretary's approval for sales under that name. The Secretary's inspectors determined that the composition of "Creamo" had been altered and threatened to prevent its sale under that name.

In the company's suit for injunction, it contended that the Secretary's previous approval, determining that the name was not "false or deceptive," prevented his reconsideration. The Supreme Court of the United States rejected the contention, holding the inspection-approval power was "necessarily a continuing one" and one "necessarily not exhausted by one exercise," particularly when the company had *altered* the basis upon which such approval was predicated. *Brougham v. Blanton Mfg. Co.,* 249 U.S. 495, 39 S.Ct. 363, 63 L.Ed. 725 (1918).

Such a case is distinguishable, of course, from a case where the agency *has* other effective statutory powers at its disposal and where *it* wishes to change the basis upon which its previous approval was granted. For example, the Federal Communications Commission approved, in its previous renewals of a radio-station license, a contract between the station and a church. In a subsequent renewal proceeding, however, the Commission refused to approve the contract, wishing to implement a new policy regarding such matters. The circuit court acknowledged the continuing power of the Commission to withdraw or grant its approval, a consequence of the proposition that each renewal application initiated a new original proceeding wherein the Commission could grant or deny the license according to where the public interest lay. The court pointed out, however, that the Commission in ordinary fairness owed the duty to exhaust all possible administrative avenues of complying with the Congressional purpose before it destroyed a private interest. *Churchill Tabernacle v. Federal Communications Commission,* 160 F.2d 244 (D.C.Cir.1947).

Department expressly intended to rely upon *other* administrative powers to assure the continued safeguarding of consumers' payments to the Association. It is difficult to conceive in the face of such expressions in the 1981 order that the Department construed art. 548b as delegating to it an implied power to withdraw or modify its approval, once given, after the plan had gone into effect.

Extrinsic of the terms of the 1981 order, moreover, we find under the undisputed evidence in the present case that the Association has established a large marketing organization, undertaken enormous new financial obligations, and otherwise acted in important business matters in absolute reliance upon the 1981 approval and the Department's stated intention to rely upon its other administrative powers to assure the protection of purchasers' interests. There is no suggestion that the Association was unreasonable in taking these extensive steps in reliance on the 1981 order or that such reliance was an unanticipated consequence of that order, even though this was the first such plan approved by the Department. The Legislature must have known that sellers would so rely on the Department's approval of their plans, given after an adjudicative hearing, and conduct and order their affairs accordingly. It is *un*reasonable to suppose that the Legislature simultaneously intended that sellers, in full compliance with their approved plans, might nevertheless be brought to the brink of insolvency on any given day by a Commissioner's peremptory decision to suspend payments required by such plans, without notice, on the ground that he may wish to change administrative policy in light of the agency's experience since the plans were approved. The word "approved" is drained of all rational meaning if that should be the case. Had the Legislature intended such an extraordinary result, it obviously would have supplied some means of avoiding the unfairness and distress that would follow an exercise of such a power. At minimum, it would have supplied a statutory warning of the drastic possibilities that formed part of any "approved" plan. The statute in question contains neither kind of protection. Therefore, the Legislature's omission to delegate the power expressly and specifically suggests unmistakably that it never intended the Department to have such a power.

For all the foregoing reasons, we hold the Commissioner was without authority and jurisdiction to order a reopening of the administrative proceedings in order to determine whether the Department's previous approval of the Association's plan should be modified or rescinded. We are not free to supply the power when the Legislature failed to do so and in the most pointed language evidenced its intention that the Department should use its other expressly delegated powers to effectuate the statutory purpose.

By our holdings above, it necessarily follows that the trial court properly enjoined the ongoing administrative proceedings because the Commissioner was attempting to act in excess of his powers so as to interfere with substantial business interests of the Association. *Glen Oaks Utilities, Inc. v. City of Houston,* 161 Tex. 417, 340 S.W.2d 783 (1960); *Westheimer Independent School District v. Brockette,* 567 S.W.2d 780 (Tex.1978); *Public Utility Comm'n v. Pedernales Electric Co-op.,* 678 S.W.2d 214 (Tex.App.1984, writ ref'd n.r.e.).

We should here note, however, that the injunction issued by the district court permits the Commissioner to proceed to reconsider the 1981 order, with a view toward vacating it or revising it, based upon a showing by the Department that there has been a material change in circumstances since the order was rendered. Apparently, this was viewed as permissible on a theory that all agencies *inherently* possess such a power when circumstances change. *But no administrative agency has the power to reconsider its earlier adjudicative orders, based upon a showing of changed circumstances, as a matter of inherent power.* While it is true that many statutes *do* empower an agency

to reconsider its previous adjudicative orders, with a view toward vacating or modifying them in light of changed circumstances, there is in art. 548b no language suggesting that the Department has that power by express delegation or necessary implication insofar as it would permit a reconsideration of the Department's approval of a non-insurance plan under § 1a of article 548b. A change in circumstances does not *create* in an agency the power to reopen and reconsider its previous adjudicative orders after they have become effective, although such a change may under *some* statutes *furnish the occasion* for the exercise of such a power *when* it *is* delegated expressly or by necessary implication. *Home Bldg. & L. Asso. v. Blaisdell,* 290 U.S. 398, 426, 54 S.Ct. 231, 235, 78 L.Ed. 413 (1934). The Association has not taken a cross appeal from this part of the district-court judgment; however, it lies within our power to correct that aspect of the judgment in order that the Department be limited to an exercise of its lawful powers. *City of Dallas v. Early,* 281 S.W. 883 (Tex.Civ.App.1926, writ dism'd). Accordingly, we direct that the district-court judgment be reformed to accord with the limits of the Department's jurisdiction, this to be accomplished by directing the Commission to comply with the payment provisions of the 1981 order and by prohibiting *any adjudicative* proceeding directed at a *reconsideration* of the approval given the Association's plan in the 1981 proceedings.[8]

▬ Finally, we should discuss briefly the Commissioner's contention that

in the 1981 order his predecessor expressly retained for the Department the power it now claims, so that it is wholly immaterial whether any statute confers the power upon the Department. The contention is obviously without merit. The Department may not improvise upon its express powers so as to create for itself indirectly a power not granted to it by the Legislature in express terms or by necessary implication. We can imagine nothing more at variance with representative government and the doctrine of delegated powers. *Because* an agency may *only* exercise the powers expressly delegated to it by statute and those necessarily implied, it may not enlarge its delegated powers by its own orders. *Railroad Commission v. Red Arrow Freight Lines, supra; Railroad Commission v. Fort Worth & D.C. Ry. Co.,* 161 S.W.2d 560 (Tex.Civ.App.1942, writ ref'd w.o.m.). Any acts in excess of the Department's jurisdiction would be void.

We therefore order the district-court judgment to be reformed in the particular noted above; and, we affirm it as reformed.

---

8. We do not here attempt to vary the rule that it ordinarily lies within the discretion of an agency to proceed either by rule-making or by adjudication. There is no rule involved in the present case. We hold simply that the powers to be exercised by the Department are limited to those conferred upon it by the Legislature, expressly or by necessary implication, and that the Department must follow the statute that the Legislature has directed it to administer. Similarly, the present case does not raise the issue of the Department's power to suppress a seller's *violation* of his approved plan, and what action it may take in such a case.

Nor do we have before us a problem concerning the extent to which an agency may, by giving its

rule retroactive effect, deprive a person of a right, privilege, immunity, or benefit he may have obtained under a previous adjudicative order issued by the agency. Such a rule obviously invokes constitutional considerations of various kinds. *See Thorpe v. Housing Authority of Durham,* 393 U.S. 268, 89 S.Ct. 518, 21 L.Ed.2d 474 (1969); *Humble Oil & Refining Co. v. Railroad Commission,* 94 S.W.2d 1197 (Tex.Civ.App.1936, writ ref'd).

Finally, because it is not before us, we do not consider the extent to which an administrative agency *must* utilize its rulemaking power, according to Tex.Rev.Civ.Stat.Ann. art. 6252–13a, *supra,* the Administrative Procedure and Texas Register Act, in making policy determinations.