

# THE ATTORNEY GENERAL
## OF TEXAS

October 24, 1988

JIM MATTOX
ATTORNEY GENERAL

Honorable Bob Bullock
Comptroller of Public Accounts
L.B.J. State Office Building
Austin, Texas    78774

Opinion No. JM-971

Re: Authority of the Racing
Commission regarding the
classification of a racing
facility (RQ-1567)

Dear Mr. Bullock:

You ask three questions concerning the authority of the Texas Racing Commission to license horse racing tracks in Texas. The Texas Racing Act, V.T.C.S. articles 179e through 179e-4, creates three classifications for horse racing tracks, class 1, class 2, and class 3. V.T.C.S. art. 179e, § 6.02. You advise us that the commission is considering proposals to limit the number of class 2 and class 3 licenses it will issue, to deny pari-mutuel wagering privileges to certain class 2 or class 3 racetracks, and to create a licensing category for horse racing tracks without wagering privileges. You ask whether the commission has the authority to take such actions.

We begin by reviewing several established principles concerning the power of administrative agencies. An administrative agency is a creature of statute and has no inherent authority. Sexton v. Mount Olivet Cemetery Association, 720 S.W.2d 129 (Tex. App. - Austin 1986, writ ref'd n.r.e.). It may exercise only those powers granted by statute together with those necessarily implied from such statutory authority. See City of Sherman v. Public Utility Commission of Texas, 643 S.W.2d 681 (Tex. 1983); Attorney General Opinion JM-903 (1988). An agency may not improvise upon its express powers so as to confer upon itself indirectly a power the legislature has not granted it expressly or by implication. Sexton v. Mount Olivet Cemetery Association, supra. The power to grant, refuse, revoke, or cancel licenses regulating businesses and occupations is subject to these limitations. See Stauffer v. City of San Antonio, 344 S.W.2d 158 (Tex. 1961).

Your first question is whether the commission may place a numerical limit on the number of horse racing licenses issued for class 2 and class 3 tracks. Section 6.02 of article 179e provides:

> (a) Horse-racing tracks are classified as class 1 racetracks, class 2 racetracks, and class 3 racetracks.

> (b) A class 1 racetrack is a racetrack on which racing is conducted for a minimum of 45 days in a calendar year, the number of days and the actual dates to be determined by the commission under Article 8 of this Act. A class 1 racetrack may operate only in a county with a population of not less than 750,000, according to the most recent federal census, or in a county adjacent to a county with such a population. <u>Not more than four class 1 racetracks may be licensed and operated in this state</u>.

> (c) A class 2 racetrack is a racetrack on which racing is conducted for a number of days not to exceed 44 days in a calendar year except as otherwise provided by this section. . . . The commission may permit an association that holds a class 2 racetrack license and that is located in a national historic district to conduct horse races for more than 44 days in a calendar year.

> (d) A class 3 racetrack is a racetrack operated by a county or a nonprofit fair under Article 12 of this Act. An association that holds a class 3 racetrack license and that conducted horse races in 1986 may conduct races for a number of days not to exceed 16 days in a calendar year on the dates selected by the association. (Emphasis added.)

Sections 6.04(d) and 6.14(b) both provide that the commission shall not issue licenses for more than three greyhound racetracks in the state.

Those provisions make clear that when the legislature intends to place numerical limitations on the issuance of racetrack licenses, it does so expressly. Therefore, the statute must be construed as containing no implied numerical

limitations on class 2 and class 3 racetrack licenses.   See Attorney General Opinion JM-206 (1984).

The racing commission argues, however, that various provisions of the Texas Racing Act grant the commission the discretion to impose reasonable ceilings on the number of class 2 and class 3 licenses it issues.  Section 6.04(a) of the act states in part that the commission "may issue a racetrack license to a qualified person if it finds that the conduct of race meetings at the proposed track and location will be in the public interest."  Section 6.06(a) provides in part that the commission may refuse to issue a racetrack license if, after notice and hearing, it has reasonable grounds to believe and finds that, among other things, "the applicant is engaged in activities or practices that the commission finds are detrimental to the best interests of the public and the sport of greyhound racing or horse racing."  V.T.C.S. art. 179e, § 6.06(a)(16).  Article 179e-3 provides the following:

> The appropriate section of the commission shall require a complete personal, financial, and business background check of the applicant for a racetrack license, the partners, stockholders, concessionaires, management personnel, management firms, and creditors and shall refuse to issue or renew a license or approve a concession or management contract if, in the sole discretion of that section of the commission, the background checks reveal anything which might be detrimental to the public interest or the racing industry.

Those provisions, however, are addressed to the denial of individual applications, which must be done on a case-by-case basis.  They give the commission no authority to set numerical limits on the number of licenses issued for a particular class of racetrack.  Accordingly, we conclude that the Texas Racing Commission has no authority to place limits on the number of class 2 or class 3 racetrack licenses it will issue.

You next ask whether the commission may grant a class 2 or class 3 racetrack license but deny pari-mutuel wagering privileges to an association operating a racetrack in a jurisdiction where the voters have approved pari-mutuel wagering on horse racing by local option election.  We conclude that the commission has no such authority.

Section 3.02 of the Texas Racing Act describes the scope of the commission's power to regulate horse and greyhound racing under the act:

> In accordance with Section 3.01 of this Act, the commission shall regulate and supervise every race meeting involving wagering on the result of greyhound or horse racing. All persons and things relating to the operation of those meetings are subject to regulation and supervision. The commission shall adopt rules for conducting racing involving wagering and shall adopt other rules to administer this Act that are consistent with this Act.

V.T.C.S. art. 179e, § 3.02. Section 1.03(25) defines "racetrack" to mean "a facility that is licensed under this Act for the conduct of pari-mutuel wagering on greyhound racing or horse racing." An "association" is "a person licensed under this Act to conduct a horse race meeting or a greyhound race meeting with pari-mutuel wagering." Id. § 1.03(2). Thus, when subsections (c) and (d) of section 6.02 speak of "associations" licensed to conduct horse races on class 2 or class 3 "racetracks," such licensees are by definition authorized to conduct horse races with pari-mutuel wagering privileges. See also id. §§ 6.01 (a person may not conduct race meetings with wagering on the results without a racetrack license); 6.08 (a horse racing association shall make certain deductions from each pari-mutuel pool); 11.01 (pari-mutuel wagering may be conducted only by an association within its enclosure); 16.01(a) (commission shall not issue racetrack license until voters have approved legalization of pari-mutuel wagering on horse or greyhound races in the county at local option election). The commission therefore may not issue class 2 or class 3 racetrack licenses that deny the holders of those licenses the privilege of conducting races with pari-mutuel wagering on the outcome of the races. Bexar County Bail Bond Board v. Deckard, 604 S.W.2d 214 (Tex. Civ. App. - San Antonio 1980, no writ).

Your third question is whether the commission may create a new licensing category for racetracks without pari-mutuel privileges. "Licensing" is the issuance of a permit confirming the licensee's right to do that which would otherwise be unlawful. Lipsey v. Texas Department of Health, 727 S.W.2d 61 (Tex. App. - Austin 1987, writ ref'd n.r.e.). The Texas Racing Act does not make it unlawful for persons to conduct horse races without pari-mutuel wagering

on the results, and it is readily acknowledged that the  act does not expressly grant the commission the power to require such persons  to  obtain  a  license  from  the  commission. However,  it  is  suggested  that  V.T.C.S.  article  179e-4 implicitly supplies such authority:

> Any provision in this Act to the  contrary notwithstanding, the Texas Racing  Commission shall  regulate  all  aspects  of  greyhound racing  and  horse  racing  in  this  state, whether  or  not  that  racing  involves pari-mutuel wagering.

This provision plainly  extends the commission's  power to regulate horse racing  to  include racetracks  on  which races are conducted without pari-mutuel wagering.  The power to regulate a business, however, does not embrace the  power to require  licenses  from  persons  subject  to  regulation unless  the  legislature  so  provides.  State  Board  of Morticians v.  Cortez, 333  S.W.2d  839 (Tex.  1960).  Your third question, therefore, is answered in the negative.

## S U M M A R Y

> The  Texas  Racing  Commission  is  not authorized to  set  arbitrary limits  on  the number  of  class  2  or  class  3  racetrack licenses that may  be issued  in this  state. The commission is not  authorized to grant  a class 2 racetrack license with the  condition that the  license  holder shall  not  conduct horse races with pari-mutuel wagering on  the results.  The commission is not authorized to license racetracks that do not conduct  horse races  with  pari-mutuel  wagering  on  the results of the races.

Very truly yours,

JIM    MATTOX
Attorney General of Texas

MARY KELLER
First Assistant Attorney General

LOU MCCREARY
Executive Assistant Attorney General

JUDGE ZOLLIE STEAKLEY
Special Assistant Attorney General

RICK GILPIN
Chairman, Opinion Committee

Prepared by Steve Aragon
Assistant Attorney General