**STAR HOUSTON, INC., Appellant,**

v.

**TEXAS DEPARTMENT OF TRANSPOR-TATION, MOTOR VEHICLE DIVISION; and Saab Cars U.S.A., Inc., Appellees.**

No. 03–96–00676–CV.

Court of Appeals of Texas, Austin.

Oct. 16, 1997.

William David Coffey, III, Wm. David Coffey, III, Austin, for Appellant.

Lloyd E. Ferguson, Strasburger & Price, L.L.P., Austin, for Saab Cars U.S.A.

Dan Morales, Attorney General, Mary A. Keeney, Assistant Attorney General, Austin, for Texas Dept. Of Transportation, Motor Vehicle Bd.

Before CARROLL, C.J., and ABOUSSIE and B.A. SMITH, JJ.

CARROLL, Justice.

This case arises out of the termination of appellant Star Houston's franchise and the revocation of its license to sell Saab vehicles in Houston, Texas. Star brought an administrative appeal of an order of the Texas Department of Transportation, Motor Vehicle Division ("the Commission")[1] that allowed appellee Saab Cars U.S.A., Inc. to terminate its franchise agreement with Star. Star also brought several declaratory judgment claims against the Commission. The trial court dismissed the declaratory judgment claims and affirmed the Commission's order. Star appeals by ten points of error. We will modify the dismissal and affirm the judgment of the district court as modified.

## BACKGROUND

Star is a car dealership in Houston, Texas, that entered into a franchise agreement with Saab Cars U.S.A., Inc., to sell Saab vehicles. Star also entered into agreements with other car manufacturers to sell other makes of cars. Star had Texas licenses to operate its franchises under the agreements. *See* Tex. Rev.Civ. Stat. Ann. art. 4413(36), § 4.01(a) (West Supp.1997) ("Texas Motor Vehicle Commission Code" or "TMVC Code").

Pursuant to its franchise agreements, Star purchased and displayed signs on its property to advertise the cars it had for sale. In 1993, Saab approached Star with a new sign package and asked Star to purchase and display the new signs. According to Saab, the new signs were necessary to successfully market its new 900 models, which were scheduled to debut coincident with the display of the new signs. Star declined to purchase the new signs for various reasons, including that the Houston sign ordinance would not permit display of the new signs along with the signs Star already displayed for its other franchises. After failed attempts to negotiate, Saab notified Star that it intended to terminate its franchise.

The TMVC Code allows dealers threatened with franchise termination to protest termination before the Commission. *See* TMVC Code § 5.02(b)(3) (West Supp.1997). If a dealer protests timely, the manufacturer may not terminate the franchise until the Commission determines good cause exists to do so. *See id.* § 5.02(b)(3)(iv). Star protested Saab's threatened franchise termination and a hearing examiner conducted an evidentiary hearing. The hearing examiner then issued a proposal for decision determining that Saab had good cause to terminate Star's franchise.

On May 18, 1995, the Commission convened in open session to discuss the examiner's proposal. The Commission did not adopt the proposal but orally ordered the

---

1. The Motor Vehicle Board of the Texas Department of Transportation is also known as the Texas Motor Vehicle Commission. Tex.Rev.Civ. Stat. Ann. art. 4413(36) § 2.01(b) (West Supp. 1997).

parties to mediate their dispute before June 30, 1995. The Commission did not reduce the order to writing until after the June deadline had passed. The parties did not mediate their dispute and the Commission did not attempt to force them to mediate.

The Commission reconvened in open session on September 7, 1995, to consider the case. The Commission withdrew its prior order to mediate, reopened the evidentiary record to allow Star to admit additional evidence, and then adopted the examiner's proposal for decision. Shortly thereafter, the Commission revoked Star's license to operate as a Saab dealer. The Commission did not send another notice or conduct another hearing before revoking the license.

Star sought judicial review of the Commission's final order in district court pursuant to the Administrative Procedure Act ("APA"). *See* Tex. Gov't Code Ann. §§ 2001.171, .174 (West Supp.1997). Star also challenged the order and the license revocation by seeking a declaratory judgment pursuant to the APA and the Uniform Declaratory Judgments Act ("UDJA"). *See* APA § 2001.038 (West Supp. 1997); Tex. Civ. Prac. & Rem.Code Ann. §§ 37.001–.011 (West 1997). The Commission filed a plea in abatement, arguing sovereign immunity barred Star's declaratory judgment claims. The district court dismissed the declaratory judgment actions with prejudice. The court later affirmed the Commission's order allowing Saab to terminate Star's franchise.

Star challenges the district court's order of dismissal and judgment in ten points of error. Star primarily argues: (1) the Commission erred in failing to enforce the May 18 order; (2) the September 7 order is invalid because of voting improprieties; (3) the September 7 order is not supported by substantial evidence; (4) the Commission violated the TMVC Code by promulgating the September 7 order; (5) Star did not receive adequate notice of the subject of the Commission proceedings; and (6) the district court erred in dismissing Star's declaratory judgment claim concerning the revocation of its license without additional notice and hearing.

## DISCUSSION

### *Finality of the May 18 order*

█ In point of error four, Star contends the Commission erred in failing to enforce the May 18 oral order because it was unchallenged and final. Star further contends the finality of the May 18 order divested the Commission of jurisdiction to enter the September 7 order. Star's entire argument is based on the premise that the May 18 oral pronouncement was final within the meaning of the APA and the TMVC Code.

Neither the APA nor the TMVC Code defines a "final order." The APA merely explains when an agency's ultimate decision in a case becomes final; it does not explain what constitutes an ultimate decision. *See* APA § 2001.144. The APA does require final decisions to be reduced to writing or to be stated on the record. *See* APA § 2001.141 (West Supp.1997). Similarly, the TMVC Code requires the Commission to take actions "conducive to the issuance of a final order" and to "thereafter issue a written final decision or order" but the TMVC Code does not define the meaning of "final order." *See* TMVC Code § 3.08(g) (West Supp.1997). Star interprets these provisions as meaning every agency order written or stated on the record is a final order. This interpretation is not supported by the statutes. Nor does it comport with established caselaw.

█ According to the supreme court, a final agency order is one: (1) that is definitive, (2) promulgated in a formal manner, (3) with which the agency expects compliance, and (4) that fixes some legal relationship *as a consummation of the administrative process. See Texas–New Mexico Power v. Texas Indus. Energy Consumers*, 806 S.W.2d 230, 232 (Tex.1991) (emphasis added). A "final order" is not necessarily the last order issued in an administrative proceeding. *See State v. Public Util. Comm'n*, 840 S.W.2d 650, 654 (Tex.App.—Austin 1992), *rev'd in part on other grounds*, 883 S.W.2d 190 (Tex. 1994). However, so long as matters remain open, unfinished, or inconclusive, there is no final decision. *Id.* For example, an order that requires subsequent agency approval is not final. *North Alamo Water Supply Corp.*

*v. Texas Dep't of Health,* 839 S.W.2d 448, 450 (Tex.App.—Austin 1992, writ denied) (citing *Walker Creek Homeowners Ass'n v. Texas Dep't of Health Resources,* 581 S.W.2d 196, 198 (Tex.Civ.App.—Austin 1979, no writ)).

The May 18 order at issue here meets three of the four criteria for a final order. It was definitive in that it expressed the Commission's intent that the parties mediate their dispute before the next meeting. It was arguably promulgated in a formal manner because it was passed at an open meeting and eventually reduced to writing. We assume the Commission intended the parties to comply with the order because the Commission did not retract its order at the May 18 meeting.

However, in issuing the May 18 order, the Commission did not purport to decide the dispute between the parties. At best, the order was an attempt to require the parties to resolve some of their differences without Commission intervention. The Division Director present at the May 18 meeting was the first to propose ordering mediation. He proposed issuing:

> an *interim* order on the part of the board forcing [the parties] to go before somebody and see if they can work this out until such time as the July board meeting *when we can take it up again for a final order as to what needs to be done.*

(Emphasis added.) A Commission member moved to order the parties to mediation; the motion was seconded and passed by unanimous vote. The commissioners then discussed the particulars of the order, so that the Division Director could reduce the order to writing in the form of an "interim order." The discussion reveals the Commission's intent that the parties attempt to agree by the end of June; the discussion also reveals the Commission's intent to "rehear" the matter in July. Following the discussion, Star's representative agreed to the interim resolution.

■ The record clearly reveals the May 18 order was by no stretch of the imagination intended to be a final adjudication of the parties' rights. In fact, an order to mediate by its very nature cannot be a final order. Furthermore, the agency would be abdicating its statutory responsibilities by trying to

make such an order final. Until an agency issues an effective final order, the agency retains jurisdiction over the matter and can withdraw previous orders and issue new ones. *See Lone Star Greyhound Park v. Texas Racing Comm'n,* 863 S.W.2d 742, 745–46 (Tex.App.—Austin 1993, writ denied). The agency did not err in withdrawing its May 18 order and substituting a new order on September 7. We, therefore, overrule point of error four.

### Validity of Vote at September 7 Meeting

■ In point of error one, Star argues the Commission's September 7 decision is invalid because three of the members who voted on the decision were not qualified for office. In support of its argument, Star cites TMVC Code section 2.06. Section 2.06, entitled "Oath," provides:

> Members of the Commission qualify by taking the constitutional oath of office which shall, with the certificate of appointment, be filed with the Secretary of State who shall issue a commission as evidence of the authority of the members to act.

TMVC Code § 2.06 (West 1976). Star provided evidence to the district court that, on September 7, 1995, the Secretary of State's files did not contain commissions for three of the voting members. Star reasons that without the commissions, the members were not authorized to act.

■ We disagree with Star's argument. Section 2.06 does not condition a member's qualification on the issuance of a commission by the Secretary of State. Section 2.06 conditions a member's qualification on the taking of the oath of office. There is no evidence in the record that suggests the three members failed to take the oath of office. The commission is mere evidence of the members' authority; it is not required for the members to transact business. *See Callaghan v. McGown,* 90 S.W. 319, 323 (Tex.Civ.App.—San Antonio 1905, writ ref'd). We, therefore, overrule Star's first point of error.

■ In points of error two and three, Star contends the September 7 order is void because (1) the Chairman had a duty to vote but did not, and (2) the order is not sup-

ported by the requisite number of affirmative votes. All six commission members were present at the September 7 meeting but only five voted. Three members voted to adopt the final order and two voted against it. The Chairman apparently abstained, although he did not state the reason for his abstention. According to the Commission, the Chairman customarily abstains from voting except in the case of a tie or to create a tie to defeat a motion.

Star cites several cases in support of its argument that the Chairman had a duty to vote. *See, e.g., Meador–Brady Management Corp. v. Texas Motor Vehicle Comm'n,* 866 S.W.2d 593, 596 (Tex.1993); *Wolff v. Travelers Ins. Co.,* 410 S.W.2d 36, 37 (Tex.Civ. App.—Austin 1966, writ ref'd n.r.e.); *State ex rel. Rea v. Etheridge,* 32 S.W.2d 828 (Tex. Comm'n App.1930, op. adopted); *State ex rel. Young v. Yates,* 19 Mont. 239, 47 P. 1004 (1897).

None of the cases Star cites imposes a general duty upon board members to participate in every vote. This Court in *Wolff* interpreted a workers' compensation statute requiring a "unanimous vote" to transact certain agency business. *See Wolff,* 410 S.W.2d at 37. The Court concluded the statute required an affirmative vote of all three agency members in order to transact that business. The *Wolff* decision did not impose a common law duty to vote on members of all state agencies; the holding was specific to the statute at issue in that case. The decision does not apply by analogy because the TMVC Code does not require the Commission to vote unanimously to affirm a proposal for decision. Therefore, *Wolff* is not dispositive of this case. *See also Etheridge,* 32 S.W.2d at 829 (particular statute required two-thirds of entire city council, not two-thirds of those present and voting).

Neither does *Meador–Brady* support Star's argument, although it did involve the Commission and the TMVC Code. In *Meador–Brady,* four of six members were present at a meeting to consider an application for a license. Two members voted to issue the license, one member voted not to issue

the license, and the Chairman abstained. The Commission issued the license and Meador–Brady challenged the order as not supported by an adequate number of votes. The supreme court addressed whether the vote was sufficient to sustain the order. The TMVC Code required then, as it does now, a "majority vote of a quorum" to adopt a final decision. *See* TMVC Code § 3.08(g). A quorum was and still is "a majority" of the Commission. TMVC Code § 2.08(a) (West Supp.1997). The Commission had a quorum to transact business because four members were present at the meeting. The supreme court concluded, however, that the motion did not pass because the two affirmative votes did not constitute a majority of the quorum. *Id.* Under the facts of *Meador–Brady,* the minimum number of affirmative votes needed to pass the motion under the statute was a majority of the members that constituted the quorum—three of the four. *See Meador–Brady,* 866 S.W.2d at 596–97.

Star emphasizes the supreme court's statement that "a 'majority vote of a quorum' means a majority of the quorum itself, not a majority of those voting when a quorum is present." *Id.* at 596. This statement, when read in the context of the *Meador–Brady* facts, does not impose a duty on the Chairman to participate in every vote. The statement simply means a vote of two-to-one is not enough to pass a motion under the TMVC Code, and possibly that the Chairman may not be counted to establish a quorum and then refuse to vote.[2] In the present case, the Chairman's presence was not necessary to establish a quorum and a majority of the voting members voted to adopt the order. The number of affirmative votes was three; the vote, therefore, satisfied the minimum requirements of the TMVC Code as interpreted in *Meador–Brady.*

In summary, we find no authority for the proposition that the common law requires board members to participate in every vote. Furthermore, the applicable statute does not prohibit the Chairman from abstain-

---

**2.** *Young,* the Montana case Star cites, merely discusses the latter proposition. *See State ex rel.*

*Young v. Yates,* 19 Mont. 239, 47 P. 1004, 1005–1006 (1897).

ing unless the Chairman is necessary to establish a quorum. *See Meador–Brady*, 866 S.W.2d at 596. This case does not present that situation. We, therefore, overrule point of error two.

 Our interpretation of *Meador–Brady* also disposes of point of error three. Star argues the TMVC Code requires a majority vote of the members *present* at the meeting, rather than a majority vote of the members *voting* at the meeting. Star cites *Meador–Brady* for this proposition.[3] We have already interpreted *Meador–Brady* as discussing the limited circumstance of a vote taken when the minimum number of members are present to establish a quorum. *Meador–Brady* does not concern situations in which more than four members, i.e., more than a

quorum, are present at a meeting. We hold under such circumstances, the TMVC Code does not require a majority vote of all members present at the meeting. It requires a majority vote of the members voting (assuming of course, that at least four are voting). Accordingly, we overrule point of error three.

## Evidence Supporting September 7 Order

In its fifth point of error, Star challenges fifteen findings of fact and one conclusion of law.[4] The findings generally concern the hearing examiner's determination that Saab's proposed sign program was reasonable and reasonably presented.[5] The examiner further determined Star's wholesale rejection of the program was unreasonable.[6] The findings also reveal Star did not introduce evi-

---

3. Star also cites the Code Construction Act and the construction rules for civil statutes to support its argument that a majority of the members present at a meeting is required to pass a motion. *See* Tex. Gov't Code Ann. §§ 311.013(a), 312.004 (West 1988). Because the TMVC Code specifically defines the word "majority" in describing the number of votes required for Commission business, we do not rely upon the default provisions of the code and statutory construction statutes. *See id.* §§ 311.011(b), 312.004 (West 1988); TMVC Code §§ 2.08(a), 3.08(g).

4. We do not approve of Star's challenging sixteen elements of the final order in a single point of error. Each of the fifteen findings conveys a different idea and distinct evidence supports each finding. Star risks rejection of the multifarious point of error. *Hollifield v. Hollifield*, 925 S.W.2d 153, 155 (Tex.App.—Austin 1996, no writ). We will, nevertheless, address the issues, albeit in the same conglomerate manner Star presents them.

5. The findings pertaining to this issue read as follows:
 9. The signage requirement proposed by Saab for Star was reasonable.
 11. Saab made all conceivable efforts to resolve [Star's] concerns regarding the implementation of the sign program at [Star].
 13. Saab never attempted to require Star to agree to display signs that would violate local ordinances. The proposed agreement was subject to the approval of the signs by the City of Houston.
 14. It is not reasonable to preclude a manufacturer from requiring a multifranchise dealer to participate in a reasonable signage program absent any evidence of objection or threatened termination due to

the new signage by a dealer's other manufacturers.
 36. The expectation by a manufacturer that a dealer purchase reasonable signage depicting the manufacturer's trademark is not against public policy.
 38. · The Saab dealer agreement requires the dealer to erect lawful signs to advertise its business which Saab, in its sole judgment, deems necessary, and the Board finds reasonable.
 41. Saab had no intent to erect any signs at Star that would violate any provision of Houston's sign ordinance, and intended that all necessary permits and/or waivers would be obtained by [the sign company].
 43. Saab has not allocated any of the new 900 series cars to Star.
 44. The Houston area is the worst performing market in the Southern Region for Saab.

6. The findings pertaining to this issue read as follows:
 10. Star's refusal to participate in the signage program proposal submitted by Saab was unreasonable, and constitutes good cause for Saab to terminate the franchise.
 37. Allowing [Star] to misuse the protection of the Motor Vehicle Commission Code to block reasonable signage upgrades by a manufacturer is inappropriate and injurious to the public welfare.
 40. Star has failed to agree to erect reasonable signage which Saab has determined is necessary to properly advertise its business, which constitutes noncompliance with a reasonable and material provision of the franchise agreement.
 42. Star has refused to purchase the parts and tools necessary to have full service capability for the new 900 series.

dence supporting its defensive theories.[7] The hearing examiner concluded Saab had established by a preponderance of the evidence that good cause existed to terminate Star's franchise agreement. *See* TMVC Code § 5.02(b)(5) (West Supp.1997). Star does not argue the evidence before the hearing examiner was insufficient to support the findings and conclusion. Instead, Star contends the evidence admitted at the September 7 meeting invalidated the original body of evidence.[8]

 The agency alone has the power to weigh the evidence and assess the credibility of the witnesses. We will not supplant the Commission's assessment of the evidence with our own unless we conclude reasonable minds could not have reached the agency's conclusion. *See Texas State Bd. of Dental Exam'rs v. Sizemore,* 759 S.W.2d 114, 116 (Tex.1988); *Meier Infiniti Co. v. Motor Vehicle Bd.,* 918 S.W.2d 95, 99 (Tex.App.—Austin 1996, writ denied). We will, therefore, determine whether the Commission could reasonably have adopted the challenged findings and conclusion in light of the late-admitted evidence.

 The late-admitted evidence included, among other things, the original franchise agreement between the parties and an agreement the parties entered into after the evidentiary hearing but before the September 7 meeting. The original franchise agreement provided that Star erect Saab signs determined *by Saab* to be necessary, provided the signs were permissible under applicable city ordinances. The agreement the parties reached after the evidentiary hearing evidences Saab's final attempt to get Star to agree to implement a new sign program, and Star's insistence that it would comply only if the sign program were "lawful and appropriate in relation to the [signage] of other franchises." The evidence also included a letter

from a City of Houston official declaring Saab's proposed sign program "impermissible," in part because of Star's existing signs for other franchises. Star generally contends these documents reveal Saab attempted to force Star into implementing an illegal sign program.

The documents can reasonably be construed another way. That is, Saab simply sought a commitment from Star that it would implement a sign program in the future if the program ultimately met the requirements of city ordinances. The franchise agreement clearly evidences Saab's intent to require only *legal* signage. Nothing in the record suggests Saab intended to force Star to implement a new sign program deemed illegal by the City of Houston. In fact, the record suggests Saab told Star it would negotiate and alter its proposal to meet the requirements of city ordinances. Saab repeatedly attempted to allay Star's professed concerns about engineering problems, and Star in turn continually raised new objections to Saab's proposals. In signing the post-hearing agreement, Star did not attempt to reach an agreeable solution but merely parroted the conditions of the original franchise agreement. The letter from the city official opining that one particular signage proposal was impermissible under the city's sign code does not excuse Star from refusing to agree on some other legal sign program.

The evidence suggests Star's real concern was that Saab's new sign program would interfere with its signage agreements for other franchises. Nothing in the record suggests Saab agreed to tailor *its* signage proposals to *other* franchisors' needs. In short, the late-admitted evidence does not contradict the challenged findings because it does not conclusively establish that Saab's request for a commitment from Star was unreason-

---

7. The findings that pertain to this issue read as follows:

15. There was no evidence to establish that erecting the new signage for Saab would cause Star to be required to bring all the signage on the premises into compliance with the current sign code.

16. Star did not contest the reasonableness or the materiality of the signage program

proposed by Saab. In fact, [Star] commended the program.

8. For purposes of deciding this point of error, we will assume without deciding that the agency had the power to "reopen" the evidence and admit Star's evidence after the evidentiary hearing. *See* TMVC Code § 3.07(g) (West Supp.1997).

able or that Star reasonably tried to implement a new sign program.

■ Neither does the late-admitted evidence contradict the challenged conclusion of law that Saab established good cause to terminate Star's franchise. Breach of a franchise agreement is a ground for termination of a franchise. *See* TMVC Code § 5.02(b)(5)(F). Star's repeated stonewalling of Saab's new sign program could be construed as a breach of the franchise agreement provision regarding the implementation of Saab sign programs. The possibility that the new signage might interfere with Star's other franchises does not excuse it from compliance with the Saab franchise agreement. Because reasonable minds could have adopted the challenged findings and conclusion even in light of the late-admitted evidence, we overrule Star's fifth point of error.

### Alleged Violation of TMVC Code

■ By point of error seven, Star contends the Board violated section 5.01(4) of the TMVC Code when it adopted its final order. Section 5.01(4) reads:

It is unlawful for any franchised dealer to operate without appropriate signs readily and easily visible to the public, identifying the franchised dealer's place of business and the products the franchised dealer offers for sale. In the event of a conflict with another law or ordinance, this Subdivision prevails, and in the event of a dispute, the Board has exclusive jurisdiction to determine whether a sign or signs are in compliance with the terms of this Subdivision. *In the event of a dispute, the Board shall uphold local ordinances of a home-rule city and protect franchised dealers from retribution by manufacturers or distributors for having complied with local ordinances.*

TMVC Code § 5.01(4) (West Supp.1997) (emphasis added). Star intimates the Commission's order punishes Star for having insisted on erecting only lawful signage. We disagree. The evidence establishes Saab was willing to change its sign program to comply with local ordinances. The Commission's order upholds the termination based on Star's failure to take steps to erect lawful Saab

signage. The Commission did not violate section 5.01(4) and we overrule point of error seven.

### Adequacy of Notice

■ In points of error six and eight, Star argues the Commission's order is invalid because Saab did not give Star proper notice of Saab's basis for termination of the franchise. Saab notified Star in writing that it intended to terminate Star's franchise, citing as the sole reason Star's refusal to comply with the signage clause in the original franchise agreement. Saab further stated that the failure to participate in the signage program was grounds for termination of the franchise under "section 23.B(18)" of the franchise agreement. The Commission adopted an order effectively deciding Star failed to comply with the signage requirements *and* that Star performed poorly in its assigned market.

Star first contends that Saab's notice was improper because it incorrectly referenced the franchise agreement. The signage clause clearly appears in the franchise agreement. "Section 23.B(18)," however, does not. Star does not challenge the existence of the signage clause; nor does it claim it was unaware of the signage clause. Star merely complains of Saab's reference to the non-existent "section 23.B(18)," arguing the reference deprived Star of notice of the true basis for further proceedings before the Commission. Star also challenges the Commission's adoption of the findings of fact regarding Star's poor performance in its assigned market because Saab's original termination letter did not cite poor performance as a basis for termination.

Star does not suggest the incorrect reference to "section 23.B(18)" had any effect on its ability to defend against the termination of its franchise. The termination letter clearly referenced the signage provision in the franchise agreement. That Star introduced evidence of its existing signage and argued its objections to Saab's new signage program at the evidentiary hearing reveals Star was aware of the substance of the dispute before the Commission. Moreover, although the franchise agreement does not specifically list the signage provision as a

potential basis for termination, the TMVC Code provides that breach of any clause of a franchise agreement can support termination of the franchise. TMVC Code § 5.02(b)(5)(F). We decline to invalidate the entire Commission proceeding merely because Saab's termination letter included a reference to a non-existent provision when the record reveals the reference did not prejudice Star.

Because we uphold the Commission's decision based on its resolution of the signage issue, we need not decide whether Saab was required to give Star notice of the other performance issues the Board considered in its final order. We overrule points of error six and eight.

### Dismissal of Declaratory Judgment Claim

In addition to its administrative appeal, Star brought a declaratory judgment action in district court challenging many of the Commission's actions, including the revocation of Star's Saab dealership license without notice or a hearing in violation of APA section 2001.054. *See* APA § 2001.054 (West Supp.1997). Star cited as authority for its declaratory judgment claims section 2001.038 of the APA and the UDJA. *See* APA § 2001.038 (West Supp.1997); Tex. Civ. Prac. & Rem.Code Ann. §§ 37.001—.011. The Commission filed a plea to the jurisdiction, asserting sovereign immunity deprived the court of jurisdiction over the claims. Star filed a response to the plea but never amended its original petition. The court granted the plea and dismissed Star's declaratory judgment claims with prejudice.

■ In point of error nine, Star argues the district court erred in dismissing its claim that the Commission violated APA section 2001.054 by revoking its Saab dealership license without notice and a hearing. Star does not challenge the dismissal of its other declaratory judgment claims. We must determine, therefore, whether Star's claim that the Commission violated APA section 2001.054 is maintainable against the Commission, a state agency, under section 2001.038 of the APA or the UDJA.

Star's claim is not cognizable under section 2001.038 of the APA. That statute allows certain parties to challenge agency rules, and Star's unamended original petition does not challenge the validity or applicability of any administrative rule of the Commission.

■ Similarly, Star's petition does not assert a cause of action cognizable under the UDJA. The UDJA enables a person whose

rights, status, or other legal relations are affected by a statute, municipal ordinance, contract, or franchise [to] have determined any question of construction or validity arising under the instrument, statute, ordinance, contract, or franchise and obtain a declaration of rights, status, or other legal relations thereunder.

UDJA § 37.004(a). The Texas Supreme Court has interpreted this provision as: (1) a waiver of sovereign immunity from suits brought to construe or to determine the validity of statutes, and (2) a waiver of sovereign immunity from liability for attorneys' fees sought in conjunction with those suits. *See City of LaPorte v. Barfield*, 898 S.W.2d 288, 297 (Tex.1995) (construing *Texas Educ. Agency v. Leeper*, 893 S.W.2d 432, 446 (Tex. 1994)); *see also Ben Robinson v. Texas Workers' Compensation Comm'n*, 934 S.W.2d 149, 153 (Tex.App.—Austin 1996, writ denied). Star does not allege in its petition, however, that the Commission wrongfully construed section 2001.054 of the APA or that the section is invalid. Star contended the Commission failed to follow the unambiguous, valid statute. Star cites no authority for the proposition that the UDJA waives sovereign immunity from suits of this type.

Star alleges on appeal that the Commission's action, or inaction, constitutes a deprivation of due process. Star did not plead that cause of action before the trial court. Neither did Star: (1) plead violation of any other statute; (2) sue any agency official; or (3) seek any other type of equitable relief. Because Star failed to plead a valid cause of action, the district court did not err in dismissing the declaratory judgment action relating to the Commission's failure to conduct a hearing on the license revocation.

■ The district court did err, however, in dismissing the cause "with prejudice." A trial court is powerless to dismiss a cause

"with prejudice" after determining it lacks subject-matter jurisdiction over the cause. *See, e.g., Stephanou v. Texas Medical Liab. Ins. Underwriting Assoc.,* 792 S.W.2d 498, 500 (Tex.App.—Houston [1st Dist.] 1990, writ denied); *Schenker v. City of San Antonio,* 369 S.W.2d 626, 630 (Tex.Civ.App.—San Antonio 1963, writ ref'd n.r.e.). We, therefore, overrule point of error nine but modify the judgment of dismissal to delete the words "with prejudice."

### Estoppel

At the hearing on the merits of the administrative appeal, Saab raised an estoppel argument and the trial court held an evidentiary hearing on whether Star was estopped from maintaining the appeal. Star later challenged the propriety of the procedure. The trial court ultimately rendered a judgment that the Commission's order "be affirmed." Star in an abundance of caution brings its final point of error challenging the judgment insofar as it sustains Saab's estoppel defense. Whether the trial court reached the estoppel issue is unclear. In any event, we need not address the estoppel argument because even if the trial court did reach the issue and erroneously affirmed the Commission's order on estoppel grounds, the outcome of this case would not change. Star has failed to challenge successfully the order itself. We, therefore, overrule Star's tenth point of error.

### CONCLUSION

We have overruled Star's points of error. We, therefore, modify the terms of the dismissal and affirm the district court's judgment as modified.