TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN






NO. 03-99-00359-CV







Texas Department of Banking; Randall S. James, Banking Commissioner; and Carole
Keeton Rylander, Texas Comptroller of Public Accounts, Appellants (1)


v.



Mount Olivet Cemetery Association, Appellee






FROM THE DISTRICT COURT OF TRAVIS COUNTY, 53RD JUDICIAL DISTRICT


NO. 98-06266, HONORABLE SUZANNE COVINGTON, JUDGE PRESIDING 







 This appeal arises from a dispute between appellee Mount Olivet Cemetery
Association ("Mount Olivet") and appellants the Banking Commissioner (the "Commissioner"),
the Texas Department of Banking (the "Department"), and the Comptroller of Public Accounts
(the "Comptroller") (2) as to whether certain funds from prepaid funeral contracts escheat to the
State by virtue of the abandoned-property laws. (3) The district court ruled in favor of Mount
Olivet, declaring that these funds are not subject to escheat under such laws and awarding Mount
Olivet attorney's fees. The State appeals, asserting that the district court lacked jurisdiction and
that the abandoned-property laws apply to the funds at issue. Because we conclude that the
district court had jurisdiction to adjudicate Mount Olivet's claims and that Mount Olivet is not
subject to the abandoned-property laws, we will affirm the district court's judgment.


FACTUAL & LEGAL BACKGROUND

 Mount Olivet markets and sells prepaid funeral benefits to those who wish to
arrange and pay for their funerals in advance of needing such services. Pursuant to the Texas
Finance Code, the Department regulates the sale of prepaid funeral services and merchandise. 
See Tex. Rev. Civ. Stat. Ann. art. 548b (repealed 1997 and codified at Tex. Fin. Code Ann.
§§ 154.001-.414 (West 1998 & Supp. 2000)). (4) The primary purpose of article 548b is to protect
purchasers who have contracted and paid in advance for funeral services. See Sexton v. Mount
Olivet Cemetery Ass'n, 720 S.W.2d 129, 133 (Tex. App.--Austin 1986, writ ref'd n.r.e.) (Mount
Olivet I). When promulgated in 1955, section 5 of article 548b provided the only method for the
sale of prepaid funeral services. See Act of May 31, 1955, 54th Leg., R.S., ch. 512, 1955 Tex.
Gen. Laws 1292, 1293. In pertinent part, section 5 provided:


[A]ll funds collected under contracts for prepaid funeral expenses . . . shall be
placed in a state or national bank, or building and loan association in this State and
so deposited not less than thirty (30) days after collection, to be held in a trust fund
in this State for the use, benefit and protection of purchasers of such contracts.


Id.

 In 1963 the legislature amended article 548b by adding section 1a, which provided
two additional methods for the sale and protection of prepaid funeral benefits: (1) a fund created
by a "contract of insurance with an insurance company licensed in Texas" or (2) a "fund,
investment, debenture, security, or contract . . . approved by the . . . Department as safeguarding
the rights and interests of the individual and his heirs and assigns to substantially the same or
greater degree as . . . funds regulated by Section 5." Act of May 23, 1963, 58th Leg., R.S., ch.
496, § 2, 1963 Tex. Gen. Laws 1304, 1304. The legislature considered these two additional
methods of sale as exceptions to section 5's more general provisions. See id.

 In 1981 Mount Olivet applied to the Department for approval of a section 1a plan
(the "Mount Olivet Plan"). Following an adjudicative hearing before the Commissioner, the
Department approved the Mount Olivet Plan under section 1a. See Mount Olivet I, 720 S.W.2d
at 134. According to the terms of the Mount Olivet Plan, all proceeds from the sale of funeral-benefit contracts are deposited in the Mount Olivet Trust. An independent trustee periodically
distributes accrued earnings from the Mount Olivet Trust to Mount Olivet, and Mount Olivet uses
these earnings for the provision of funeral and related services and to operate and improve its
cemeteries. 

 In 1991 section 5A, providing that some prepaid funeral benefits were presumed
abandoned under certain conditions, was added to article 548b. See Act of July 23, 1991, 72d
Leg., 1st C.S., ch. 1, § 1, 1991 Tex. Gen. Laws 1, 1-2. 

 In 1993 the legislature amended section 5A to read as follows: (5)


(a) Money paid by a purchaser of a prepaid funeral benefits contract is personal
property subject to presumption of abandonment and delivery to the comptroller
under Title 6, Property Code. (6) This subchapter controls in case of conflict with
that title.


(b) Money paid by a purchaser of a prepaid funerals benefits contract and held in
the name of the seller at a depository under [Section 5] is presumed abandoned if:


 (1) the amount due the seller . . . has been collected and:


 (A) the seller has not known the existence and location of the purchaser
or the beneficiary of the contract for the three preceding years;


 (B) according to the knowledge and records of the seller, a claim to the
money or contract has not been asserted or an act of ownership of the
money or contract has not been exercised during the three preceding years;


 (C) at least 60 years have elapsed since the date the purchaser executed
the contract; and


 (D) at least 90 years have elapsed since the date of birth of the beneficiary
of the contract; or

 (2) the amount due the seller . . . has not been paid and during the three
preceding years:


 (A) the purchaser has not made a payment . . . ;


 (B) the seller has not known the existence and location of the purchaser
or the beneficiary of the contract; and


 (C) according to the knowledge and records of the seller, a claim to the
money or contract has not been asserted and an act of ownership of the
money or contract has not been exercised.



Tex. Fin. Code Ann. § 154.301 (West 1998) (footnote added). (7) In the 1993 Act, the legislature
included a grandfather clause: 


A fund, investment, security, or contract included in a plan approved before the
effective date of this Act by the Banking Department of Texas under section 1a
. . . may continue in effect. Any funds pursuant to such a plan under a contract
entered into before, on, or after the effective date of this Act shall continue to be
handled in accordance with that approved plan . . . .


Act of May 26, 1993, 73d Leg., R.S., ch. 808, § 4, 1993 Tex. Gen. Laws 3211, 3228 (emphasis
added). 

 In 1995 disputes between Mount Olivet and the State began over whether the funds
held under the Mount Olivet Plan were subject to escheat. Mount Olivet argued they were not,
but the State asserted that certain funds held by Mount Olivet were abandoned property and must
be delivered to the Comptroller under the abandoned-property laws. According to Mount Olivet,
a Department auditor stated in a 1995 audit report that certain of Mount Olivet's funds appear to
be abandoned property that should escheat to the State. As suggested by the Department, Mount
Olivet met and corresponded with the State to explain its position. Neither party took any further
action in 1995. In 1996 the auditor repeated the earlier notation in a later audit report. Mount
Olivet further corresponded with the State, but again no action was taken. In 1997 a Department
auditor's report stated that Mount Olivet had violated article 548b by failing to remit certain funds
and that these funds should escheat to the State immediately. The Department again invited
Mount Olivet to explain why the funds should not escheat and Mount Olivet responded with a
seven-page letter. In February 1998 the Department notified Mount Olivet that it did not agree
with Mount Olivet's analysis. After further attempts at negotiation failed, the Department notified
Mount Olivet in May 1998 that Mount Olivet's failure to escheat the funds violated state law and
that the Department would refer this violation to the Comptroller for possible enforcement.

 Mount Olivet brought this action to resolve the statutory-construction dispute. 
Specifically, Mount Olivet asked for a temporary and permanent injunction prohibiting the State
from "taking any action impairing the [Mount Olivet] Plan or requiring delivery of allegedly
abandoned property to the Comptroller, or from initiating any administrative, civil or criminal
penalty or enforcement proceedings against [Mount Olivet]." Under the Uniform Declaratory
Judgments Act ("Declaratory Judgments Act"), (8) Mount Olivet asked the court to declare that
Mount Olivet is not required to deliver the funds at issue to the Comptroller and that the
Department's rules regarding abandoned property (9) do not apply to Mount Olivet. Mount Olivet
also asked for attorney's fees. The State filed a plea to the jurisdiction, which the court denied. 
The State then counterclaimed for the delivery of the unclaimed funds held by Mount Olivet.

 The parties filed competing motions for partial summary judgment on the issue of
whether the funds held by Mount Olivet should escheat to the State. In its motion, Mount Olivet
asked the district court to declare that Mount Olivet is not subject to the abandoned-property laws
set forth in article 548b or in title six of the Property Code (10) and that Mount Olivet is not subject
to the Department's administrative rules applicable to abandoned property. After a hearing, the
district court granted Mount Olivet's motion and denied the State's motion. Mount Olivet then
filed a motion seeking an award of a stipulated amount of attorney's fees pursuant to the
Declaratory Judgments Act. The district court awarded Mount Olivet attorney's fees and
incorporated that award in a final judgment, which also included the order granting Mount
Olivet's motion for partial summary judgment. The State complains on appeal that: (1) Mount
Olivet is subject to the abandoned-property laws and therefore must escheat the abandoned funds
to the State (11) and (2) Mount Olivet did not plead facts sufficient to confer jurisdiction on the
district court for either the declaratory or the injunctive relief sought. We will initially address
the State's second issue. 

DISCUSSION

I. Jurisdiction

 The State argues in its second issue that "[Mount Olivet]'s petition failed to allege
any facts that would confer jurisdiction on the trial court." Specifically, the State claims that
Mount Olivet lacked standing to file a declaratory-judgment action and suit for injunction against
the State in the sense that (1) Mount Olivet did not allege a waiver of sovereign immunity, (2)
Mount Olivet's claim was not ripe for adjudication, and (3) a declaratory-judgment action pursuant
to the Administrative Procedure Act is "inappropriate." The State also argues that (1) Mount
Olivet's pleadings did not support injunctive relief and (2) Mount Olivet pleaded no facts to
support its allegations of constitutional deprivation. Whether the district court properly denied
the State's plea to the jurisdiction presents a pure question of law that we will review de novo. 
See State Farm Lloyds v. Kessler, 932 S.W.2d 732, 735 (Tex. App.--Fort Worth 1996, writ
denied).


A. Sovereign Immunity

 Generally, sovereign immunity, unless waived, protects the State, its agencies, and
its officials from lawsuits for damages, absent legislative consent to sue the State. See Federal
Sign v. Texas S. Univ., 951 S.W.2d 401, 405 (Tex. 1997). However, a "party can maintain a suit
to determine its rights without legislative permission." Id. (citing Cobb v. Harrington, 190
S.W.2d 709, 712 (Tex. 1945)). Here, Mount Olivet brought a declaratory-judgment action to
determine its rights under certain abandoned-property laws, and its pleadings reflected such. (12) 
The supreme court has interpreted the Declaratory Judgments Act as a waiver of sovereign
immunity from suits brought to construe statutes. See City of LaPorte v. Barfield, 898 S.W.2d
288, 297 (Tex. 1995); Star Houston, Inc. v. Texas Dep't of Transp., 957 S.W.2d 102, 111 (Tex.
App.--Austin 1997, pet. denied). We hold that sovereign immunity does not bar Mount Olivet's
suit for declaratory relief.


B. Ripeness

 The State also argues that Mount Olivet lacked standing because there was no
justiciable controversy ripe for adjudication. Before a court may address the merits of any case,
the court must have jurisdiction over the party or the property subject to the suit and over the
subject matter, jurisdiction to enter the particular judgment, and capacity to act as a court. See
Austin ISD v. Sierra Club, 495 S.W.2d 878, 881 (Tex. 1973). Subject matter jurisdiction requires
that the party bringing the suit have standing, that there be a live controversy between the parties,
and that the case be justiciable. See Texas Ass'n of Bus. v. Texas Air Control Bd., 852 S.W.2d
440, 443-46 (Tex. 1993). If the district court lacks jurisdiction, in any of these senses, then its
decision would not bind the parties. See Sierra Club, 495 S.W.2d at 881 (noting that collateral
attacks on judgment are allowed when district court lacked jurisdiction). A decision that does not
bind the parties is, by definition, an advisory opinion prohibited by Texas law. See Texas Ass'n
of Bus., 852 S.W.2d at 444 (citing Tex. Const. art. II, § 1, as prohibiting advisory opinions). 

 Ripeness is an element of subject-matter jurisdiction meant to conserve "judicial
time and resources for real and current controversies, rather than abstract, hypothetical, or remote
disputes." Mayhew v. Town of Sunnyvale, 964 S.W.2d 922, 928 (Tex. 1998). Ripeness examines
when an action may be brought. See Patterson v. Planned Parenthood, 971 S.W.2d 439, 442
(Tex. 1998). In order for a party to present a justiciable controversy, facts must be sufficiently
developed so that an injury has occurred or is likely to occur, rather than being contingent or
remote. See id. "A case is not ripe when its resolution depends on contingent or hypothetical
facts, or upon events that have not yet come to pass." Id. at 443. Under the Declaratory
Judgments Act, 


[i]t is not necessary that a person who seeks a declaration of rights . . . shall have
incurred . . . damage or injury . . . but it has frequently been held that an action
for declaratory judgment would lie when the fact situation manifests the presence
of "ripening seeds of a controversy." Such appear where the claims of several
parties are present and indicative of threatened litigation in the immediate future
which seems unavoidable, even though the differences between the parties as to
their legal rights have not reached the state of an actual controversy.



Texas Dep't of Pub. Safety v. Moore, 985 S.W.2d 149, 153-54 (Tex. App.--Austin 1998, no pet.)
(quoting Ainsworth v. Oil City Brass Works, 271 S.W.2d 754, 761 (Tex. Civ. App.--Beaumont
1954, no writ)).

 The dispute between Mount Olivet and the State began in 1995, when the
Department stated in its annual audit of Mount Olivet that certain funds appeared to be abandoned
property that should be escheated to the State. The statement was repeated in later audits, and in
1997 the auditor's report stated that Mount Olivet had violated article 548b by failing to remit to
the State the funds that were in question. The Department also sent Mount Olivet a letter stating
that its failure to escheat the funds violated state law. This notice of statutory violation subjected
Mount Olivet to possible civil and criminal penalties. See Tex. Fin. Code Ann. §§ 154.406 (civil
penalties), 154.402 (criminal penalties) (West 1998). By May 1998 the Department had cited
Mount Olivet for violation of a statute, had refused to negotiate any short-term settlement of
Mount Olivet's remitting the funds, and had referred the matter to the Comptroller for
enforcement action. 

 The State argues that because Mount Olivet had suffered no actual injury and
because there was no agency order in place affecting Mount Olivet's rights, the controversy was
not ripe. However, ripeness does not require an actual injury; Mount Olivet is only required to
show that an injury is likely to occur. See Patterson, 971 S.W.2d at 442. Also, there is no
requirement that an agency undertake an enforcement action before the potential subject of that
action can file suit for declaratory judgment. (13) See Moore, 985 S.W.2d at 153-54 (in declaratory-judgment context, ripeness only requires "ripening seeds of a controversy"). We are not
persuaded by the State's arguments. We hold that, under the facts of this case, a ripe, justiciable
controversy exists, not an abstract or hypothetical dispute.


C. Additional Jurisdictional Arguments

 The State argues that "[Mount Olivet] may not seek a declaratory review of the
Finance Code through the back door by alleging some infirmity of the rules promulgated by the
Commissioner in support of the administration of the code." Mount Olivet alleged in its pleadings
that the district court also had jurisdiction to hear its claims under section 2001.038 of the
Government Code, which authorizes the filing of a declaratory-judgment action to determine the
validity of any rule adopted by an administrative agency. See Tex. Gov't Code Ann. § 2001.038
(West 2000). Because we have determined that the district court had jurisdiction under the
Declaratory Judgments Act, we do not address this argument. See Tex. R. App. P. 47.1. It is
unnecessary to determine if Mount Olivet properly invoked the Government Code to confer
jurisdiction over Mount Olivet's complaint about the administrative rules because the State does
not complain about Mount Olivet's use of the Government Code in that manner.

 The State also argues that there were no pleadings to support injunctive relief. 
However, Mount Olivet did not seek an injunction in its motion for partial summary judgment,
and the district court did not award Mount Olivet injunctive relief. It is therefore unnecessary to
consider the State's point. See id. The State also asserts that Mount Olivet pleaded no facts to
support its allegation of a constitutional deprivation. Because Mount Olivet did not allege that any
statute or rule was unconstitutional or that there has been a taking, we will not address the State's
argument. See id.

 Having disposed of all of the State's jurisdictional arguments, we hold that the
district court had jurisdiction over Mount Olivet's claims and overrule the State's second issue.

II. Abandoned Property

 The district court ruled that Mount Olivet was not subject to either the abandoned-property laws in article 548b or title six of the Property Code. (14) Construing the State's first issue
broadly, see supra note 11, we understand the State to challenge both of these declarations.

 Statutory construction is a question of law. See Johnson v. City of Fort Worth, 774
S.W.2d 653, 656 (Tex. 1989). Our objective when we construe a statute is to determine and give
effect to the legislature's intent. See Liberty Mut. Ins. Co. v. Garrison Contractors, Inc., 966
S.W.2d 482, 484 (Tex. 1998); Union Bankers Ins. Co. v. Shelton, 889 S.W.2d 278, 280 (Tex.
1994). "To ascertain legislative intent, we must look to the statute as a whole and not to its
isolated provisions." Morrison v. Chan, 699 S.W.2d 205, 208 (Tex. 1985). As the State points
out, the goal of the court is to "ascertain the consistent purpose of all legislative enactments and
to carry out the legislative intent by giving effect to all laws bearing on the same subject." 
International Ins. Agency, Inc. v. Railroad Comm'n, 893 S.W.2d 204, 209 (Tex. App.--Austin
1995, writ denied). This is true even if the laws were enacted by different sessions of the
legislature. See id. 

 Mount Olivet is a section 1a seller. The State neither clearly concedes nor disputes
Mount Olivet's status as a section 1a seller; however, this Court has previously confirmed that
the Mount Olivet Plan was within section 1a. See Mount Olivet I, 720 S.W.2d at 134 (stating that
after adjudicative hearing before Commissioner, Department issued order that approved Mount
Olivet Plan under section 1a). Because Mount Olivet falls within section 1a, it is not a seller
under section 5, nor is it subject to its guidelines. As articulated by this Court in Mount Olivet
I, section 5 "may be avoided by a seller . . . [and] compliance with Section 5 is excused, if the
seller's contracts are based upon a plan whereby the necessary funds are supplied from a fund,
investment, security, or contract . . . approved by the Department as safeguarding the right and
interests of the [purchasers] to substantially the same or greater degree as . . . Section 5." Mount
Olivet I, 720 S.W.2d at 134. 


A. Whether Mount Olivet is Subject to Section 5A

 Having established that Mount Olivet is a section 1a seller, we turn our attention
next to section 5A and whether its provisions apply to Mount Olivet. In subsection (b), section
5A states: "Funds paid by a purchaser of a prepaid funeral benefits contract . . . under Section
5 are presumed abandoned if . . . ." Act of May 26, 1993, 73d Leg., R.S., ch. 808, § 1, 1993
Tex. Gen. Laws 3211, 3223 (emphasis added). (15) It is clear from the statute itself that subsection
(b) of section 5A expressly applies to section 5 plans and not to section 1a plans. Thus, as a
section 1a seller, Mount Olivet is not subject to any of the provisions in subsection (b) of section
5A.


B. Whether Mount Olivet Is Subject to Title Six of the Property Code

 The State argues that under subsection (a) of section 5A, Mount Olivet is subject
to title six of the Property Code. Subsection (a) states, "Funds paid by a purchaser of a prepaid
funeral benefits contract are personal property subject to presumption of abandonment and
delivery to the [Comptroller] under Title 6, Property Code. In the event of a conflict between the
provisions of that title and this section, this section controls." Id.

 The Property Code declares personal property abandoned if, for longer than three
years: (1) the existence and location of the owner of the property is unknown to the holder of the
property; and (2) according to the knowledge and records of the holder of the property, a claim
to the property has not been asserted or an act of ownership of the property has not been
exercised. See Tex. Prop. Code Ann. § 72.101(a) (West 1995). Once property is presumed
abandoned, the Comptroller assumes responsibility for it and essentially steps into the shoes of
the absent owner. See Melton v. State, 993 S.W.2d 95, 102 (Tex. 1999). The purpose of
removing abandoned property from the possession of the holder is to relieve that holder of any
further liability with regard to such property and place it in the hands of the State, thereby
providing a means for the absent owner to reclaim the abandoned property. See Tex. Prop. Code
Ann. § 74.304 (West Supp. 1998); State v. Texas Elec. Serv. Co., 488 S.W.2d 878, 881-82 (Tex.
Civ. App.--Fort Worth 1972, no writ), overruled on other grounds sub. nom. State v. Liquidating
Trustee of Republic Petroleum Co., 510 S.W.2d 311 (Tex. 1974). The State contends that since
Mount Olivet is subject to subsection (a) of section 5A and certain Mount Olivet funds fall within
the category of abandoned property, such funds escheat to the State. Under the State's
construction of article 548b, subsection (a) clarified that title six of the Property Code applies to
all sellers of prepaid funerals; then, in subsection (b), article 548b carves out a special exception
for section 5 plans. The State asserts that the Property Code applied to Mount Olivet even before
the 1991 amendment, which first introduced subsection (a). According to the State, the 1991
amendment (and subsequent 1993 amendment) only made the law more specific with regard to
section 5 plans and did not in any way repeal the existing law under the Property Code to which
Mount Olivet was already subject.

 Both parties rely on American Surety Co. v. Axtell Co., 36 S.W.2d 715, 718 (Tex.
1931), to instruct the Court on the proper interpretation of article 548b:


To arrive at the intention of the Legislature, . . . it is the duty . . . to look
primarily to the act itself as an entirety; and to understand the legal effect of the
amendment enacted by the Legislature, it must be considered in connection with
the original act, and that which has been done thereunder. A particular section of
an act of the Legislature, when enacted, must be construed in view of the existence
of the original statute as it stands after the amendment is introduced; it and all
sections of the old law must be regarded as a harmonious whole, as connected with
and naturally acting upon each other. . . . It will be presumed that the
Legislature, in adopting the amendment, intended to make some change in the
existing law, and therefore the courts will endeavor to give some effect to the
amendment.


36 S.W.2d at 718 (internal citations and quotations omitted). 

 This Court is thus bound to conclude that the legislature, in amending article 548b,
intended to change existing law. The State argues that the only change the legislature intended
was to provide more specific regulation for section 5 plans. Mount Olivet argues that in enacting
subsection (a) (which provides that prepaid funerals are subject to the Property Code) along with
subsection (b) (which regulates Section 5 plans), the legislature changed prior law, which did not
subject prepaid funerals to the Property Code, and subjected prepaid funerals to the Property Code
for the first time. We agree with Mount Olivet. The only way to give effect to subsection (a) is
to conclude that prepaid funerals were not subject to title six of the Property Code before the
legislature passed subsection (a). If this court were to conclude otherwise, section (a) would have
no effect, and we must "give some effect to the amendment." Id.

 Legislative history confirms the Court's interpretation. Both the bill analyses
prepared by the Senate Committee on Appropriations and the House Research Organization
recognized that before the 1991 amendment, prepaid-funeral funds were not abandoned property
subject to the Property Code; a particular law was needed in order that the State reap the benefits
of holding abandoned funeral contracts. See Senate Comm. on Appropriations, Bill Analysis,
Tex. S.B. 9, 72d Leg., 1st C.S. (1991); House Research Org., Bill Analysis of S.B. 9, 72d Leg.,
1st C.S. (July 22, 1991).

 Having determined that prepaid funeral contracts were not subject to title six of the
Property Code prior to the 1991 amendment to article 548b, we must next decide if the
amendment itself subjected section 1a plans to the Property Code. Subsection (a) states that
prepaid funeral contracts are personal property subject to presumption of abandonment and
delivery to the Comptroller under title 6 of the Property Code. The State's position is that
subsection (a) merely restates existing law that all prepaid funerals are subject to the Property
Code. 

 In the 1993 amendment, the legislature included all the amended portions of article
548b in section one. Then, in an entirely separate section, it exempted section 1a plans: 

A fund investment, security, or contract included in a plan approved . . . by the
[Department] under Section 1a . . . may continue in effect. Any funds paid
pursuant to such a plan . . . shall continue to be handled in accordance with that
approved plan.


Act of May 26, 1993, 73d Leg., R.S., ch. 808, § 4(a), 1993 Tex. Gen. Laws 3211, 3228. We
believe that based on its clear language and location in the Act, section 4 exempted section 1a
plans from the entire 1993 Act. (16) The State has no argument to the contrary.

 We are further persuaded that section 1a plans are exempt from the entire 1993
amendment because it would lead to absurd results if they were not. Courts should not read a
statute to create an absurd result. See Barshop v. Medina County Underground Water
Conservation Dist., 925 S.W.2d 618, 629 (Tex. 1996). If section 1a plans were subject to the
Property Code, section 5 plans would receive the benefit of section 5A, mandating that between
sixty and ninety years must pass before the funds could escheat to the State, but section 1a plans
would have to escheat the funds in three years. Thus, if the purchaser of the prepaid funeral has
fully paid the contract and has not contacted Mount Olivet in the last three years to assert
ownership over the prepaid funeral, the funds from the contract would escheat to the State. This
would be an absurd result in two ways. First, a plan that had been specially approved by the
Department as providing the same or greater protection as a section 5 plan would be subject to
much harsher abandonment laws. We believe that the legislature intended no such distinction
between section 5 and section 1a plans. Second, the legislature carefully crafted subsection (b)
of section 5A to protect the expectations of purchasers by extending the abandonment period to
sixty years after the purchase date of the prepaid funeral, and ninety years after the birth date of
the individual who is to receive the prepaid funeral. We think it clear that the legislature did not
intend section 1a plans to be subject to escheat in just three years. We further observe that it is
likely that once a person prepays a funeral the person's family would not contact Mount Olivet
until the payee's death, which could often be more than three years from the last contract
payment. In fact, the family might not even know of the prepayment arrangement until the
decedent's personal papers were examined post mortem.

 Moreover, the legislature has previously exempted section 1a plans from provisions
within article 548b. See Act of May 28, 1987, 70th Leg., R.S., ch. 747, § 2, 1987 Tex. Gen.
Laws 2677, 2681 (exempting Mount Olivet from participation in guaranty fund). Both the 1987
and 1993 grandfather clauses demonstrate that the legislature intended section 1a plans to continue
to be handled in accordance with the terms of the plan and not be subject to any further regulation. 

 After examining the statute and its relevant provisions and taking into account its
purpose of protecting purchasers, we hold that Mount Olivet is not subject to title six of the
Property Code. Instead, Mount Olivet is governed by its approved plan. (17) We overrule the
State's first issue.

CONCLUSION

 Having overruled both of the State's issues, we affirm the district-court judgment. (18)



 


 Lee Yeakel, Justice


Before Chief Justice Aboussie, Justices B. A. Smith and Yeakel


Affirmed


Filed: August 31, 2000


Publish

1. This appeal was originally filed in the names of the predecessors to the present Banking
Commissioner. We have substituted the current holder of that office as the correct party to this
proceeding. See Tex. R. App. P. 7.2(a).
2. We will refer to appellants collectively as the "State" unless separate reference is required.
3. Two sets of abandoned-property laws are at issue in this appeal. See Tex. Fin. Code Ann.
§§ 154.001-.414 (West 1998 & Supp. 2000); Tex. Prop. Code Ann. §§ 71.001-75.102 (West
1995 & Supp. 2000). We will refer to these laws jointly as "abandoned-property laws."
4. In 1997 article 548b was codified in the Finance Code. See Act of May 24, 1997, 75th
Leg., R.S., ch. 1008, § 1, 1997 Tex. Gen. Laws 3091, 3385 (Tex. Rev. Civ. Stat. Ann. art 548b,
since repealed and codified at Tex. Fin. Code Ann. §§ 154.001-.414 (West 1998 & Supp. 2000)). 
Because the 1997 Act was intended as a codification only, making no substantive change in the
law, see id. § 7 at 3603, and all parties refer in their briefs to article 548b, we will cite to the
pertinent provisions of former article 548b, unless the context of our discussion requires citation
to the Finance Code. We will refer in the text generally to the above law as "article 548b."
5. See Act of May 26, 1993, 73d Leg., R.S., ch. 808, § 1, 1993 Tex. Gen. Laws 3211, 3223-24. At the same time, the legislature renumbered article 548b and section 5A became section 5B;
for convenience, we will continue to refer to this section as section 5A, as did the parties in their
briefs. 
6. The Property Code generally provides that if an owner of personal property does not
perform an act of ownership within three years, the property is presumed abandoned and should
escheat to the State. See Tex. Prop. Code Ann. § 72.101 (West 1995); Melton v. State, 993
S.W.2d 95, 102 (Tex. 1999).
7. There were no amendments to section 5A between the 1993 amendment and the codification
in 1997. For convenience, we quote the Finance Code here.
8. Tex. Civ. Prac. & Rem. Code Ann. §§ 37.001-.011 (West 1997 & Supp. 2000).
9. Mount Olivet specifically complains about sections 25.11(b)(11) and 25.12(g) of title seven
of the Texas Administrative Code. See 7 Tex. Admin. Code §§ 25.11(b)(11), 25.17(g) (1999).
10. Tex. Prop. Code Ann. §§ 71.001-75.102. We will refer to these statutes as "title six of
the Property Code."
11. It is unclear from the State's brief whether it is arguing that Mount Olivet is subject to the
abandoned-property laws in article 548b. Construing the State's argument broadly, we will
address this issue. See Tex. R. App. P. 38.1, .9.
12. We do not consider Mount Olivet's request for injunction because the district-court
judgment awarded only declaratory relief, not injunctive relief. 
13. The State argues that Edgewood ISD v. Meno, 917 S.W.2d 717, 741 (Tex. 1995), requires
that "there must be an existing commissioner's order pursuant to the challenged statute in order
for the parties to have standing to attack." Edgewood ISD is not as broad as the State contends.
14. The State does not attack that portion of the judgment declaring that "[Mount Olivet] is not
subject to the requirements set forth in 7 Texas Administrative Code §§ 25.11(b)(11) and
25.12(g)."
15. In their briefs, both parties frame their arguments around the 1991 amendment, which first
passed section 5A. The amendment that is most relevant to this case, however, is the 1993
amendment, which was the last change to section 5A before codification.
16. Section 4 of the 1993 Act was not included in the 1997 codification of article 548b. 
Because the codification was not intended to make substantive changes, we will rely, in this
particular case, on the wording of the statute before the codification.
17. The parties join issue over whether the Mount Olivet Trust is a holder under the Property
Code. See Tex. Prop. Code Ann. § 72.001(e) (West 1995). Because we have determined that
Mount Olivet is not subject to title six of the Property Code, we do not reach this issue. See Tex.
R. App. P. 47.1.
18. The State in its brief generally discusses what it perceives to be the "pernicious effects" of
the district-court judgment. Any such "effects" arise by virtue of applying the law to the facts
of this case, as we have done in our examination of the State's issues. We will not address this
argument separately.


older of that office as the correct party to this
proceeding. See Tex. R. App. P. 7.2(a).
2. We will refer to appellants collectively as the "State" unless separate reference is required.
3. Two sets of abandoned-property laws are at issue in this appeal. See Tex. Fin. Code Ann.
§§ 154.001-.414 (West 1998 & Supp. 2000); Tex. Prop. Code Ann. §§ 71.001-75.102 (West
1995 & Supp. 2000). We will refer to these laws jointly as "abandoned-property laws."
4. In 1997 article 548b was codified in the Finance Code. See Act of May 24, 1997, 75th
Leg., R.S., ch. 1008, § 1, 1997 Tex. Gen. Laws 3091, 3385 (Tex. Rev. Civ. Stat. Ann. art 548b,
since repealed and codified at Tex. Fin. Code Ann. §§ 154.001-.414 (West 1998 & Supp. 2000)). 
Because the 1997 Act was intended as a codification only, making no substantive change in the
law, see id. § 7 at 3603, and all parties refer in their briefs to article 548b, we will cite to the
pertinent provisions of former article 548b, unless the context of our discussion requires citation
to the Finance Code. We will refer in the text generally to the above law as "article 548b."
5. See Act of May 26, 1993, 73d Leg., R.S., ch. 808, § 1, 1993 Tex. Gen. Laws 3211, 3223-24. At the same time, the legislature renumbered article 548b and section 5A became section 5B;
for convenience, we will continue to refer to this section as section 5A, as did the parties in their
briefs. 
6. The Property Code generally provides that if an owner of personal property does not
perform an act of ownership within three years, the property is presumed abandoned and should
escheat to the State. See Tex. Prop. Code Ann. § 72.101 (West 1995); Melton v. State, 993
S.W.2d 95, 102 (Tex. 1999).
7. There were no amendments to section 5A between the 1993 amendment and the codification
in 1997. For convenience, we quote the Finance Code here.
8. Tex. Civ. Prac. & Rem. Code Ann. §§ 37.001-.011 (West 1997 & Supp. 2000).
9. Mount Olivet specifically complains about sections 25.11(b)(11) and 25.12(g) of title seven
of the Texas Administrative Code. See 7 Tex. Admin. Code §§ 25.11(b)(11), 25.17(g) (1999).
10. Tex. Prop. Code Ann. §§ 71.001-75.102. We will refer to these statutes as "title six of
the Property Code."
11. It is unclear from the State's brief whether it is arguing that Mount Olivet is